**John HEDGES and Harold Hedges, Plaintiffs-Appellants,**

**v.**

**PUBLIC SERVICE COMPANY OF INDIANA, INC., Defendant-Appellee.**

**No. 1–479A122.**

Court of Appeals of Indiana, First District.

Nov. 27, 1979.

Rehearing Denied Dec. 21, 1979.

Robert G. Burton, Richmond, for plaintiffs-appellants.

Duegean C. Garrett and Gregory A. Troxell, Plainfield, for defendant-appellee.

LOWDERMILK, Presiding Judge.

## STATEMENT OF THE CASE

Plaintiffs-appellants John and Harold Hedges appeal a judgment in favor of the defendant Public Service Company of Indiana, Inc. (PSI) denying their claim for damages for injuries suffered as a result of their coming into contact with PSI's high-voltage transmission wires.

## FACTS

In 1969 John Hedges purchased a farm in Wayne County, Indiana. At the time of purchase the farm was in poor condition, but over the course of five years the industrious Hedges made substantial improvements: a fishing pond, horse barn, outdoor arena, etc. Rodeos and 4-H activities were held on the property at various times.

In 1974, when John was arranging the construction of the barn, he contacted PSI to request an extension of his electrical service to the proposed facilities. A PSI employee came to John's farm to gather information regarding the proposed installation. There was evidence to show that John considered the possibility of putting the service underground, for reasons of safety or aesthetics, but due either to John's unwillingness to incur the costs or PSI's refusal to install the service in that manner, high voltage wires were run on standard utility poles from the road to the barn.

On June 25, 1975, John and Harold Hedges (who worked for John, his nephew) were preparing for a rodeo which was to be held the following day. They were removing lights from temporary poles in the parking area (near the completed horse barn) to use the fixtures to illuminate a nearby pasture which was to be used for parking space. At one point in the operation, John removed one of the lights and descended from the ladder. John and Harold then grabbed the ladder, one on each side, and began carrying it in a vertical position to another location. The aluminum ladder came into contact with the uninsulated, 7200-volt power line. Both men were seriously injured.

The height of the wire above the ground at the point where the contact occurred was twenty feet, ten inches. There was conflicting evidence as to whether the sixteen-foot extension ladder was fully, partially, or only slightly extended when the men attempted to move it across the lot.

John and Harold filed their claim in the Wayne Circuit Court. Their complaint for compensatory and punitive damages was based upon negligence, breach of implied warranties, and strict liability. PSI was granted a summary judgment on the issues of implied warranty and strict liability. The case was tried to a jury on the issue of negligence, and the jury found for PSI.

## ISSUES

1. Whether the trial court erred in granting PSI's motion for summary judgment on the issues of breach of implied warranties and strict liability.

2. Whether the trial court erred in refusing the Hedges' proffered jury instructions numbered 2 and 4.

3. Whether the trial court erred in giving its own instructions numbered 6 and 7.

4. Whether the trial court erred in admitting evidence of John's prior marriages.

*Issue One*

■ The Hedges presented their strict liability claim as follows:

"6. Defendant distributed and placed into commerce and service said power lines and electrical service which were unreasonably dangerous to the ultimate user or consumer thereof, being plaintiffs, and as a result thereof, plaintiffs were injured. Defendant is strictly liable to plaintiffs."

The doctrine of strict liability as set forth in Restatement (Second) of Torts § 402A (1964) was adopted by this court in *Cornette v. Searjeant Metal Products, Inc.*, (1970) 147 Ind.App. 46, 258 N.E.2d 652.[1] *See, Ayr-Way Stores, Inc. v. Chitwood*, (1973) 261

---

1. The Indiana Legislature recently enacted § 402A at IC, 34 4-20A 1 *et seq.* (Burns Code Ed., Supp. 1979). This cause of action accrued prior to its effective date of June 1, 1978.

Ind. 86, 300 N.E.2d 335; *Perfection Paint & Color Company v. Konduris*, (1970) 147 Ind. App. 106, 258 N.E.2d 681. Section 402A as adopted at page 50 of 147 Ind.App., at page 655 of 258 N.E.2d, provides:

"Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

In *Petroski v. Northern Indiana Public Service Company*, (1976) Ind.App., 354 N.E.2d 736, 747, we stated, "Electricity is a product which can be sold within the meaning of § 402A." However, we also noted that although a literal "sale" of the product is not required, the product must be placed into the stream of commerce before § 402A strict liability can attach. *Link v. Sun Oil Company*, (1974) 160 Ind.App. 310, 312 N.E.2d 126. In *Petroski* a fourteen year old boy was injured when he came into contact with an uninsulated high-voltage wire which ran through the branches of a tree in which he was climbing. We stated at page 747 of 354 N.E.2d:

**2.** IC 26–1–2–314 (Burns Code Ed.) provides:

"(1) Unless excluded or modified (section [26 1–]2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must at least be such as

"* * * Technically, until the electricity reaches its destination in a home or factory, it is transmitted by equipment over lines under the exclusive control of NIPSCO. The electric company's transmission and distribution lines are not a part of the end product which reaches the consumer as in the case of bottles and cans which are a part of the finished product. Since NIPSCO had not yet placed its product in the stream of commerce, a judgment on the evidence on the issue of strict liability is proper in the case at bar."

The distribution lines and electrical service with which John and Harold came into contact were not products in the stream of commerce as required by § 402A. PSI's distribution lines are not sold to their customers; they are owned and controlled by the company. The only "product" that was in the process of being sold was electricity. The Hedges acknowledge the fact that high-voltage electrical energy must be stepped-down by various transformers from transmission (7200) to consumption (110/220) voltage. The Hedges encountered electrical energy in an unmarketable and unmarketed state. We find that the electricity was not in the stream of commerce and therefore § 402A strict liability would not apply. *See*, Annot., 83 A.L.R.3d 218 (1978).

▪ The Hedges also assert that PSI should be held liable on the grounds that PSI impliedly warranted that its power lines and electrical service were merchantable, IC 1971, 26–1–2–314 (Burns Code Ed.), and fit for a particular purpose, IC 1971, 26–1–2–315 (Burns Code Ed.).[2]

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

In *Helvey v. Wabash County REMC,* (1972) 151 Ind.App. 176, 278 N.E.2d 608, we determined that electricity is a "good" under the Uniform Commercial Code as enacted in this state. The plaintiffs in *Helvey* based their claim for damages to household appliances upon an alleged breach of implied and express warranties in the supplying of 135-volt, instead of the standard 110-volt, electrical current. We considered this to be a defect in the purchased good, and a claim under the U.C.C. was permitted.

We have stated that the warranty provisions of Article 2 of the Uniform Commercial Code apply to *sales* of *goods. Thompson Farms, Inc. v. Corno Feed Products, Division of National Oats Co., Inc.,* (1977) Ind.App., 366 N.E.2d 3. In *Helvey* we had no problem finding a sale of goods because the electrical current had passed through the meter and into the household electrical system for consumption. Consumption or use of that good caused damage to various appliances in the house. We stated at page 179 of 151 Ind.App., at page 610 of 278 N.E.2d:

> "It is necessary for goods to be (1) a thing; (2) existing; and (3) movable, with (2) and (3) existing simultaneously. We are of the opinion that electricity qualifies in each respect. Helvey says it is not movable and in this respect we do

not agree, if for no other reason than the monthly reminder from the electric company of how much *current has passed through the meter.* Logic would indicate that *whatever can be measured in order to establish the price to be paid* would be indicative of fulfilling both the existing and movable requirements of goods." (Our emphasis)

The high-voltage electricity with which the Hedges came into contact was not the good PSI was intending to sell or the Hedges were intending to buy. While the delivery of 135 volts of electricity under the circumstances in *Helvey* can be considered the sale of a defective good, the tragic escape of 7200 volts from the transmission wire, through the ladder, and into the bodies of these men is not a transaction in goods intended to be covered by the Uniform Commercial Code. The summary judgment with regard to this claim was proper.

■ Finally, the Hedges encourage us to adopt the doctrine of strict liability for abnormally dangerous activities as codified in the Restatement (Second) of Torts § 520 (1976),[3] and apply its provisions to the transmission of high-voltage electricity by power companies.[4]

---

(e) are adequately contained, packaged, and labeled as the agreement may require; and
(f) conform to the promises or affirmations of fact made on the container or label if any.
(3) Unless excluded or modified (section [26–1–]2–316) other implied warranties may arise from course of dealing or usage of trade."
IC 26–1–2–315 (Burns Code Ed.) provides:
"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

3. The Restatement (Second) provides:
"§ 520. ABNORMALLY DANGEROUS ACTIVITIES
In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes."

4. Without explicitly adopting § 520 we have applied the doctrine of strict liability for ultrahazardous activities in cases involving blasting operations. *Enos Coal Mining Company v. Schuchart,* (1963) 243 Ind. 692, 188 N.E.2d 406; *Wright v. Compton,* (1876) 53 Ind. 337; *Galbreath v. Engineering Construction Corporation,* (1971) 149 Ind.App. 347, 273 N.E.2d 121. *But see, Vaughn v. Peabody Coal Company,* (1978) Ind.App., 375 N.E.2d 1159.

■ We have long recognized that electricity is a *dangerous* element. *Hines v. Nichols*, (1921) 76 Ind.App. 445, 130 N.E. 140; *City of Logansport v. Smith*, (1911) 47 Ind.App. 64, 93 N.E. 883. Any company which engages in the distribution of electrical energy has a common law duty to exercise reasonable care to properly insulate its power lines in places where the general public may come into contact with them, especially adventurous children and adolescents. *Petroski, supra. See, Harris v. Indiana General Service Co.*, (1934) 206 Ind. 351, 189 N.E. 410; *Wise v. Southern Indiana Gas & Electric Co.*, (1941) 109 Ind.App. 681, 34 N.E.2d 975; *Ft. Wayne & Northern Indiana Traction Co. v. Stark*, (1920) 74 Ind.App. 669, 127 N.E. 460.

In *Southern Indiana Gas and Electric Company v. Steinmetz*, (1978) Ind.App., 377 N.E.2d 1381, 1383, 1384, we stated:

"* * * As a general rule, however, an insulating covering is not required when the lines are sufficiently isolated so that the general public could not reasonably be expected to come in contact with them. *Capitol Airways, Inc. v. Indianapolis Power & Light Co.*, (1939) 215 Ind. 462, 18 N.E.2d 776; *Denneau v. Indiana & Michigan Electric Co* (1971), 150 Ind. App. 615, 277 N.E.2d 8. The term 'general public' in this sense means those persons who could reasonably be anticipated to be dangerously close to the lines, as was stated in *Jakob v. Gary Railways, Inc.* (1947), 118 Ind.App. 13, 70 N.E.2d 753: * * *

This means, then, that an electric utility will not generally be required to insulate its wires with a covering or coating to protect only those persons who might come into contact with power lines in the course of their employment as electric utility employees, *Denneau v. Indiana & Michigan Electric Co., supra*, or while cleaning and repairing a sign near power lines, *Jakob v. Gary Railways, Inc., supra*, or while installing a TV antenna on private property. *Northern Indiana Public Service Co. v. Howard* (1957), 127 Ind. App. 488, 139 N.E. 558. * * * "

While there may be some disagreement as to what the public utilities should be able to reasonably anticipate, *see*, Judge Garrard's concurring opinion in *Petroski, supra*, it seems quite clear that we have not in the past, nor will we now, impose absolute liability upon the power companies. As we stated in *Petroski, supra*, at 743 of 354 N.E.2d:

"* * * Although some states require the exercise of utmost care by those using high voltage electricity, the standard of care required in Indiana is 'such care as a person of [reasonable] prudence would [ordinarily] use under like conditions and circumstances.' *City of Decatur v. Eady* (1917), 186 Ind. 205, 216, 115 N.E. 577, 580."

*See*, Annot., 69 A.L.R.2d 9 (1960); Annot. 82 A.L.R.3d 113 (1978); Annot. 82 A.L.R.3d 218 (1978).

We find that the trial court did not err in granting PSI's summary judgment with regard to the issue of strict liability.

*Issues Two and Three*

■ The Hedges' arguments with regard to jury instructions are little more than unsupported assertions that their instructions were preferable to those given by the court. The Hedges have not shown that the trial court's instructions were erroneous, or that they were inadequate to fulfill the function of advising the jury as to the law which was applicable to the issues and facts of the case.

Error cannot be predicated upon the trial court's refusal to give a tendered instruction if the subject matter is adequately covered by other instructions. *Frankfort v. Owens*, (1976) Ind.App., 358 N.E.2d 184; *Link v. Sun Oil Co., supra*. The trial court did not err.

*Issue Four*

■ John challenges the admissibility of evidence of his four prior marriages on the grounds that such evidence was irrelevant.

■ Relevance is the logical tendency of evidence to prove a material fact. *Lake County Council v. Arredondo*, (1977) Ind., 363 N.E.2d 218. In the complaint, John

stated that his damages included a present impairment of his earning capacity, resulting in a loss of income from his farming, cattle raising, and related enterprises. He also alleged that he had incurred permanent and lasting physical and mental impairment. At trial, John called two expert witnesses, a psychologist and a psychiatrist, to testify about his psychological well-being prior to and after the accident. Other, lay witnesses offered their opinions about John's mental health. John's present wife complained of marital difficulties and his parents testified that, after the accident, John was unable to work and could not cooperate or converse with people in a reasonable manner.

We agree with PSI that, if left unrebutted, the impression given by all this evidence was that direct cause and effect relationships existed between the accident, John's personality change, and his financial losses. In light of general experience, we find that evidence of John's prior marital problems was relevant to the issues of causation and extent of damages. *Reed v. Trainor*, (1968) 142 Ind.App. 192, 233 N.E.2d 685. The trial court did not err.

Judgment affirmed.

ROBERTSON and NEAL, JJ., concur.