HOUSTON LIGHTING & POWER
COMPANY, Appellant,

v.

Carol Ann Hauser REYNOLDS, Individually and as Natural Mother of Carl David Reynolds, and Carl David Reynolds, Individually, Appellees.

No. 01–84–00414–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

April 10, 1986.

Rehearing Denied May 29, 1986.

Larry F. York, Stephen G. Tipps, Leslie Stark Wolff, Joe R. Greenhill, Baker & Botts, Houston, for appellant.

G.P. Hardy, Hardy, Milutin, Johns & Sherrod, Donna Cywinski, McKenna & Cy-

winski, W. James Kronzer, Houston, for appellees.

S.G. Johndroe, III, Cantey, Hanger, Gooch, Munn & Collins, Beth Krugler, Cantey, Hanger, Gooch, Munn & Collins, Fort Worth, amicus curiae for Texas Elec. Service Co.

John G. Tucker, Paul W. Gertz, Orgain, Bell & Tucker, Beaumont, amicus curiae for Gulf States Utilities Co.

B.D. St. Clair, McGinnis, Lochridge & Kilgore, Austin, amicus curiae for Texas Cooperatives, Inc.

H.K. Howard, V. Elizabeth Ledbetter, Kelberg, Dyer, Redford & Weil, Corpus Christi, amicus curiae for Central Power & Light Co.

F.W. Baker, Annalyn G. Smith, Matthews & Branscomb, San Antonio, amicus curiae for City of San Antonio & Texas Public Powers Assoc. and its member Cities.

Before WARREN and DUGGAN, JJ., and TOM COLEMAN, Retired Judge.

## OPINION

TOM COLEMAN, Retired Judge.

Carl David Reynolds was severely injured when he used an aluminum pole to touch a powerline that ran through a residential neighborhood. This is an appeal from a judgment awarding him substantial damages based on a jury verdict. A major contention of Houston Lighting & Power Company in this appeal is that there is no strict products liability cause of action against electric utility companies for injuries caused by contact with high voltage distribution lines.

Carl David, a 16 year-old boy, was visiting at the home of a friend, Eric Everroad. While they were disassembling a tent that they had erected earlier in Eric's backyard, Carl David decided to connect the aluminum tent poles together to see if he could touch a powerline that was located within a six foot utility easement extending into Eric's backyard. After putting eight poles together he was able to touch the powerline, which carried approximately 35,000 volts, and as a result suffered second and third degree burns over most of his body and the eventual amputation of both of his legs and his right arm.

Houston Lighting & Power Company (hereinafter referred to as H.L. & P.) asserts that the trial court erred in submitting special issues one, two, and three, and in rendering judgment thereon, because strict products liability is not applicable to electric utilities in electrical contact cases.

An executive vice-president of H.L. & P. testified that H.L. & P. is in the business of manufacturing and selling electricity; that once electricity passes into the transmission lines, it cannot be recalled or stored; and that electricity is transmitted through its lines from the power source only in response to a demand by a consumer.

A manufacturer who places in commerce a product rendered dangerous to life or limb by reason of some defect is strictly liable in tort to one who sustains injury because of the defective condition. *Darryl v. Ford Motor Co.*, 440 S.W.2d 630, 633 (Tex.1969). In order for liability to attach, it is not necessary for the defendant to actually manufacture or sell the defective product. In order to recover for an injury on the theory of strict liability in tort, the plaintiff bears the burden of proving that the defendant: (1) placed in the stream of commerce a product; (2) that such product was in a defective or unreasonably dangerous condition; and (3) that there was a causal connection between such condition and the plaintiff's injuries or damage. *Armstrong Rubber Co. v. Urquidez*, 570 S.W.2d 374, 376 (Tex.1978).

A jury found that the failure of H.L. & P. to give adequate warnings of the danger of coming into contact with the distribution system used by it in furnishing electricity to houses located in a residential neighborhood rendered its "product," electricity, unreasonably dangerous. The jury further found that this failure to warn was a pro-

ducing cause of the injuries and damages sustained by Carl David.

■ H.L. & P. contends that the trial court erred in rendering judgment on these findings because electricity in a power line is not a product in the context of products liability. We do not agree. Electricity is a form of energy that can be made or produced by man, confined, controlled, transmitted, and distributed to be used as an energy source for heat, power, and light and is distributed in the stream of commerce. While the distribution of the electricity through a system of towers, poles, and wires may well be considered a service, the electricity itself is a consumable product. *Pierce v. Pacific Gas and Electric Co.*, 166 Cal.App.3d 68, 212 Cal.Rptr. 283 (Cal.Ct. App.1985); *Ransome v. Wisconsin Electric Power Co.*, 87 Wis.2d 605, 275 N.W.2d 641 (1979); *see also Aversa v. Public Service Electric & Gas Co.*, 186 N.J.Super. 130, 451 A.2d 976, 979 (1982); *Hedges v. Public Service Co. of Indiana*, 396 N.E.2d 933, 935 (Ind.Ct.App.1979); *Genaust v. Illinois Power Co.*, 62 Ill.2d 456, 343 N.E.2d 465 (Ill.1976).

While the furnishing of electrical energy is a service, this does not mean that the energy furnished is not also a product. *See Woods v. Littleton*, 554 S.W.2d 662 (Tex.1977). In *Woods*, the plaintiff purchased a house from a builder who promised to repair any defects that appeared within one year. The court held that the plaintiff had purchased "not only real property, but also, and in addition," services. *Id.* at 666. In that case, there was no indication that a separate consideration was paid for the service. In the case of electricity, the consumer not only purchases a product, the electricity, but in addition, the transportation of the product to the consumer's home, a service.

A more difficult question is posed by the appellant's contention that while electricity is being transported in high voltage lines, it has not yet entered the stream of commerce. In *Genaust*, the court reasoned that until electrical energy being transmitted at high voltage is changed by the use of transformers or other electrical devices into a form that a consumer can use in his home or factory, the electricity remains in the control of the power company.

The Indiana courts also follow the rule that so long as electricity is transmitted by equipment over lines under the exclusive control of the power company, the electricity has not been placed in the stream of commerce. For this reason, these courts hold that the doctrine of strict liability, as set forth in the Restatement (Second) of Torts, sec. 402A (1964), is not applicable in a case of an injury caused by coming into contact with power lines owned by a public utility. *Hedges v. Public Service Co. of Indiana*, 396 N.E.2d 933.

The plaintiff has asserted that because electric current is introduced into the defendant's transmission lines only in response to demand from customers, and cannot be recalled or stored, the electricity is no longer under the control of H.L. & P. and, therefore, has been introduced into the stream of commerce. A New Jersey Court has stated in dicta that while a sale of electricity is conclusive as to the placement of the product into the stream of commerce, evidence that the utility company relinquished exclusive control over its product may be sufficient to establish that fact. *Aversa v. Public Service & Gas Co.*, 186 N.J.Super. 130, 451 A.2d 976.

H.L. & P. asserts that it had not completely surrendered control of the electricity in its transmission lines because the electricity was not in a marketable form until it was reduced in voltage by the transformers installed for that purpose, and cites in support of its position *Genaust v. Illinois Power Co.*, 62 Ill.2d 456, 343 N.E.2d 465.

"Stream of commerce" has been defined by a Texas court in these words:

The stream of commerce includes the manufacture of the object and its distribution, including the activities of retailers.... [I]t is clear that continuation of the flow of commerce does not require transfers of possession.

*Davis v. Gibson Products Co.*, 505 S.W.2d 682, 691 (Tex.Civ.App.—San Antonio 1973, writ ref'd n.r.e.).

■ The evidence supports a conclusion that while the electricity is in the process of being delivered to the consumer through the transmission lines of the power company, it is in the stream of commerce.

■ A product cannot be said to be unreasonably dangerous because of a failure to warn unless there is a duty to warn. Electricity cannot be separated from its distribution system. The electricity contained within the distribution system is very similar to a stock of merchandise displayed for sale. A sale of electricity by H.L. & P. requires delivery from the H.L. & P. power lines to the purchaser's lines. Unless H.L. & P. could reasonably foresee danger to the general public arising out of the nature of its product *while being conducted* through the transmission lines, there was no duty to warn. *Texas & Pacific Railway Co. v. Bigham*, 90 Tex. 223, 225–26, 38 S.W. 162, 163 (1896).

■ It is said that a seller is strictly liable, even though his product is faultlessly manufactured and designed, if the product *as marketed* is unreasonably dangerous or likely to harm the user unless properly used. In such a case, the product would be in a "defective condition unreasonably dangerous" by virtue of the absence of an adequate warning. *Lopez v. Aro Corp.*, 584 S.W.2d 333 (Tex.Civ.App.—San Antonio 1979, writ ref'd n.r.e.). In *Lopez*, the court also stated that if a seller knows or should know of potential harm to a user because of the nature of its product, the seller is required to give an adequate warning of such danger.

■ However, the seller of a product only has a duty to warn of those dangers that are reasonably foreseeable and of which the plaintiff cannot reasonably be expected to be aware. *Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, 977 (5th Cir.1978). A similar holding is found in *Genaust v. Illinois Power Co.*, where the court held that there was no

duty to warn under products liability where the possibility of injury results from a common propensity of the product that is open and obvious.

■ The manufacturer also has a duty to warn against foreseeable misuse. *Blackwell Burner Co. v. Cerda*, 644 S.W.2d 512 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.). Where a warning has been given, its adequacy presents a fact question for the determination of a jury. *Ford Motor Co. v. Nowak*, 638 S.W.2d 582 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

In answer to special issue number one, the jury found that H.L. & P. failed to give an adequate warning of the dangers "with respect to coming into contact with the 35,000 volt distribution system in the backyard of the Everroad residence." The jury found that this failure rendered the electricity "as marketed" unreasonably dangerous.

■ There is evidence that the economics of the business of furnishing electricity requires that it be brought to the near vicinity of the consumer in high voltages. Whether there is a duty to warn of the danger inherent in high voltage electricity must be determined from a consideration of the conditions existing at the time the electricity is placed into the stream of commerce. The evidence necessary to establish the duty to warn in a products liability case differs from the evidence necessary to establish a duty to warn in a negligence case. A manufacturer has a legal duty to provide warnings to the public of dangers that can arise from foreseeable uses of the product. *Lopez v. Aro Corp.*, 584 S.W.2d 333.

In a case where liability is predicated on *negligence*, liability rests primarily upon two elements: (1) reason to anticipate injury, and (2) failure to perform the duty arising on account of that anticipation. *Houston Lighting & Power Co. v. Brooks*, 336 S.W.2d 603, 606 (Tex.1960). In *Brooks*, the court held that there was no evidence that the light company could reasonably foresee that the *plaintiff* would make con-

tact with its lines, and therefore, there was no evidence of negligence. In this, as in similar cases, the plaintiff was required to prove that on the occasion in question, the light company could anticipate that the plaintiff, or a person under the same or similar circumstances, would be injured in the absence of a warning of the danger of coming into contact with the power line.

H.L. & P. is aware of the dangerous propensities of electricity within overhead power lines and continually warns its employees concerning these dangers. There was evidence that it knew people might come into contact with its high voltage power lines because they had done so in the past. The company knew that the transmission lines were located on easements within the residential lots and that the lines were charged with 35,000 volts of electricity.

Jack Compton, who has a masters degree in industrial education, was employed by H.L. & P. as a safety man. He testified that he had previously given depositions in cases involving ordinary citizens contacting overhead power lines and that it was foreseeable to the company that people would come into contact with these lines. He testified that warning signs are not usually placed on transmission lines or the wooden poles on which they are carried. However, "Danger, High Voltage" signs usually are placed on transmission towers, fences surrounding substations, pad-mounted transformers, transformer vaults, and buildings.

The advertising manager for H.L. & P. testified that there have been accidents in the H.L. & P. service area and a number of them involved such circumstances as someone putting up a "t.v." or a "c.b." antenna in the backyard, a child climbing a tree or flying a kite, or someone climbing a ladder. The evidence in this case raised a duty on the part of H.L. & P., before placing the electricity in the stream of commerce, to warn of the danger incident to the presence of high voltage electricity in its transmission lines.

Special issue number one inquired about the adequacy of the warning given by H.L. & P. In connection with the submission of this issue, the term "adequate warning" was defined as meaning such warning as would both: (1) be reasonably calculated to reach the users of the product, or persons coming into contact therewith, in such a form that it would reasonably be expected to catch the attention of a reasonably prudent person in the circumstances of its use; and (2) be of such a nature as to be comprehensible to the average user and to convey a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person.

Appellant contends that there is no evidence to support the affirmative answer made by the jury to this special issue. There was evidence concerning certain warnings given by H.L. & P. Whether these warnings were "adequate" was necessarily submitted to the jury. There was evidence to support the answer to special issue number one.

Special issue number two asks whether the failure to warn adequately rendered the electricity "as marketed" unreasonably dangerous. The term "unreasonably dangerous" was defined as a product that is dangerous to an extent beyond that which would be contemplated by the ordinary user of the product with ordinary knowledge common to the community as to the product's characteristics.

There was evidence that the public generally is not knowledgeable about electrical power lines and how much electricity passes through them. Plaintiff testified that he had some familiarity with household electricity, and did not think that it would cause serious injury if contacted. He had been shocked on several occasions, but did not think that the lines in the backyard were dangerous. He knew that birds landed on the lines without injury and thought that it was necessary to touch two lines at the same time in order to get a shock. There is some evidence that the failure to warn rendered the electricity as marketed unreasonably dangerous. The

trial court was required to submit the issue. *Texas Construction Service Co. v. Allen,* 635 S.W.2d 810, 814 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.) (op. on reh'g).

■■■ H.L. & P. asserts that there was no evidence that the failure to warn was a producing cause of the injuries and damages sustained by Carl David Reynolds. The evidence previously referred to was sufficient to require the submission of this issue and to support the jury's answer thereto. The answers made by the jury to the first three special issues establish the plaintiff's case for recovery under strict products liability. *Bituminous Casualty Corp. v. Black & Decker Manufacturing Co.,* 518 S.W.2d 868 (Tex.Civ.App.—Dallas 1974, writ ref'd n.r.e.).

In answer to special issue number four, the jury found that H.L. & P. failed to exercise ordinary care by reason of a failure to give an adequate warning of the danger of coming into contact with the 35,000 volt distribution system in the backyard of the Everroad residence. H.L. & P. contends that the trial court erred in submitting this special issue and in rendering judgment thereon because H.L. & P. had no duty to warn. We sustain this point of error.

■■■ Special issue number four is a negligence issue concerned with the safety of the *distribution* system. The duty to warn must be determined by a consideration of the facts in existence at the time and at the place the injury was suffered. H.L. & P.'s power lines were some 10 feet higher than required by law. Electrical lines that are in compliance with national and state standards are not inherently dangerous. *Walker v. Texas Electric Service Co.,* 499 S.W.2d 20 (Tex.Civ.App.—Fort Worth 1973, no writ). There was no evidence that, at the time of the accident, H.L. & P. was aware of any activity in that area that would make their lines unreasonably dangerous. There was no duty to warn under these conditions. *Houston Lighting & Power Co. v. Brooks,* 161 Tex. 32, 336 S.W.2d 603 (1960); *Wilson v. Texas Elec-*

*tric Service Co.,* 265 S.W.2d 624 (Tex.Civ. App.—El Paso 1954, writ ref'd n.r.e.). The court erred by submitting special issue no. 4 to the jury.

H.L. & P. submitted a requested special issue on comparative causation in the form suggested by the Texas Supreme Court in *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (Tex.1984). The trial court refused to submit the issue, and H.L. & P. complains of the refusal to submit the issue in point of error nine.

For cases not controlled by former Tex. Rev.Civ.Stat.Ann. art. 2212a (Vernon Supp. 1984), (now Tex.Civ.Prac. & Rem.Code, ch. 33, Subch. B (Vernon Supp.1986)), the Texas Supreme Court has adopted a system that allows comparison of a plaintiff's conduct, whether characterized as the assumption of risk, misuse, or ordinary negligence, with the conduct or product of a defendant. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414. In the same opinion, however, the court reaffirmed its holding in *Shamrock Fuel & Oil Sales Co. v. Tunks,* 416 S.W.2d 779 (Tex.1967), that negligent failure to discover or guard against a product defect is not a defense to a cause of action based on strict products liability.

In *Shamrock,* the court said:

It may be argued that improper use or voluntary persistence in use after discovery of danger is encompassed within the prudent man inquiry as stated in the contributory negligence issues given by the court, but the point is that such issues ... do not submit the legitimate defenses available to one from whom damages are sought under the doctrine of strict liability—.

These defenses should be submitted specifically and not under the formula embraced by the contributory negligence issues.... Such a form of submission embraces a failure to discover a defect or to guard against ... its existence which ... is not a defense to the action."

■■■ The language quoted above indicates that the submission of a general issue on contributory negligence in a strict prod-

ucts liability case where there is evidence that the plaintiff failed to discover the product defect or to guard against possibility of a product defect would be improper.

In cases where there is no evidence of failure to discover or guard against a product defect, but there is evidence that the plaintiff's conduct involved assumption of risk, misuse, or failure to mitigate or avoid damages, a general contributory negligence issue would be proper. Chapter 30 of the Texas Civil Remedies Code now governs cases in which the plaintiff alleges only negligence or where the plaintiff fails to obtain findings of defect and producing cause, or breach of warranty, against the defendant, but does secure findings of negligence against that defendant. *Duncan*, 665 S.W.2d at 429. *Duncan* also teaches that in a case in which breach of warranty or negligence is alleged in addition to strict liability, the defendant might also be entitled to submission of both a comparative negligence issue and a comparative causation issue. *Id.* at 423.

A comment on this question is found in an article entitled *Submission of Loss Allocation Issues*—Texas State Practice by Russell H. MacMains in a pamphlet entitled *Jury Issue Submission* published by the State Bar of Texas in 1985 as a part of its professional development program.

The Texas pattern jury charge committee undertook to implement the directives in *Duncan* in the materials on comparative causation found in the supplement of 3 State Bar of Texas, *Texas Pattern Jury Charges* PJC 72.05A; 72.06; 80.11 (1982).

There is evidence that the minor plaintiff, Carl David Reynolds, was aware that electricity was dangerous. He knew that in touching the line he might get shocked, even though he claimed that he thought it might be no more of a shock than one would get working on a dimmer switch on house current. He knew that electric transmission lines on the big steel towers were dangerous. Carl did not recall whether he received any warning from Eric, his friend, regarding whether or not he might get shocked if he touched the overhead line. However, Carl stated that if he did receive such a warning, he did not think that the shock would be very bad. Although he knew that lines crossing big steel towers were dangerous, he did not think that lines through someone's backyard were dangerous.

Carl stated that he may have thought that a person would not be shocked unless he touched two lines at once. This assumption was based on the fact that in dealing with household electricity, Carl knew that there were positive wires and negative wires and a person got shocked only if he touched both wires at once. His idea of getting shocked was that it just tingles for just a couple of minutes. He had seen warning signs on the big towers that said "Danger, High Voltage." He testified that it was a big black and red sign. Carl said he never thought of the wire going through Eric's backyard as a power line; he just thought of it as a wire going through the backyard.

Eric Everroad was with Carl when he received his injury. When Carl was trying to touch the line with the tent poles, Eric said "maybe you better not do that. You might get shocked." Carl told him he was only going to touch one of the wires, adding, "You can't get shocked until you touch two of them." Eric also testified that the wires did not appear to be dangerous in any way, that they could have been telephone wires for all he knew. "He thought, however, that Carl might get shocked, that there was a chance."

From this evidence, a jury might reasonably have considered that Carl was negligent in failing to discover and appreciate the extent of the danger. A jury might also have concluded that Carl knew and realized that he might get a shock from touching the wire and that his conduct in proceeding to touch the wire was negligent. The jury might also have concluded that playing with or experimenting with the line, knowing that it might be charged with electricity, was a misuse of the electricity. The evidence raises a jury issue as to negli-

gence, requiring a causation issue under *Duncan.*

■ The special issue requested by H.L. & P. was predicated on the answers to special issue nos. 3 and 7, that more than one party's acts or products contributed to cause Carl David Reynolds injuries. Special issue no. 7 asks whether Carl's failure to use ordinary care on the occasion in question was a proximate cause of the occurrence in question. This issue was correctly refused by the trial court because the negligence issue on which it was predicated (special issue no. 6) did not eliminate from the jury's consideration the negligent failure to discover or guard against the product defect.

■ The jury's answer to special issue no. 6 did not establish a defense to plaintiff's cause of action based on strict product liability. As a result, no issue of comparative causation was required. The burden of requesting an issue in proper form on contributory negligence rested on the defendant, H.L. & P. The failure to request the issue in proper form results in a waiver of the issue. Tex.R.Civ.P. 279; *see Southern Pacific Co. v. Castro,* 493 S.W.2d 491, 498 (Tex.1973).

The first point of error asserted by H.L. & P. is that the trial court erred in failing to apportion properly the number of strikes between the parties. The trial court found no antagonism between the two defendants and aligned them as one side and the plaintiff as the other. He then gave each side six strikes and divided the strikes allocated to the defendants equally between them. In response to a statement by counsel for H.L. & P., the court ruled that H.L. & P. would be permitted to consult with its co-defendant in making strikes.

At the time of the trial court's ruling on the strikes there was one plaintiff, Reynolds, and two defendants, Chicago Tents and Textiles Company and H.L. & P. Initially, five defendants were named in addition to H.L. & P. Prior to trial, two of the defendants settled with the plaintiffs, and the plaintiff abandoned its claims against two other defendants. H.L. & P. nonsuited its claim for contribution and indemnity against these four defendants, but it retained its claim for contribution and indemnity against Chicago Tents and Textiles Company. In no other respect did the pleadings demonstrate antagonism between H.L. & P. and Chicago Tents. The statements made by counsel during the voir dire examination of the prospective jurors did not evidence any antagonism between Chicago Tents and H.L. & P. on any jury issue. In fact, the statement of counsel indicated that H.L. & P. and Chicago Tents were united in their antagonism toward the plaintiff. Counsel for H.L. & P. stated to the jury during voir dire:

Now the tent company is sued just the same as H.L. & P. in this case. I don't know what Mr. Hardy is going to say the tent company did wrong. We haven't been let in on that yet. The tent company just sold a tent that I guess had some poles. They will have the poles that boy put together in the powerline. Now what they did wrong we don't know.

Counsel for Chicago Tents stated during voir dire:

Now they can bring a lawsuit for any amount of money they want to but that doesn't mean ladies and gentlemen, that they are entitled to a dime.

The record reflects that after the voir dire examination of the jurors, counsel for Chicago Tents was approached by counsel for the plaintiff and agreed to collaborate with counsel for the plaintiff in making his jury strikes. Counsel for Chicago Tents stated at a hearing before the court that he made his strikes in the same room with the plaintiff's attorney and that they discussed some of the jurors. He stated, however, that he made his strikes independently and for the purpose of securing a jury that he considered best for the interests of his client.

When the attorney for H.L. & P. discovered that counsel for Chicago Tents had exercised his rights to three strikes independently, he filed a motion to reallocate strikes in which he stated:

Now upon returning to the courtroom having struck a jury list including six members on the assumption that they had the right to exercise the tent company's strikes, the light company's lawyers learned that the tent company had collaborated with the plaintiffs—the light company then moved the court to reallocate the strikes and give it five strikes, or some similar number.

In multiple party cases, the trial judge has the duty to determine the alignment of the parties and to equalize strikes. Tex.R. Civ.P. 233. He must determine whether any of the litigants *aligned* on the same side of the docket are antagonistic with respect to any issue to be submitted to the jury. The term "side" means one or more litigants who have common interests on a matter with which the jury is concerned. *Id.* At the time the jury was selected, the two defendants had a common interest on matters with which the jury was concerned.

■ There is no direct evidence either from the pleadings, or from statements made to the jury during voir dire, that the plaintiff and Chicago Tents had common interests on matters with which the jury was concerned. From the fact that they did collaborate to some extent on the selection of the jury, and that after the jury was selected, the plaintiff dismissed Chicago Tents from the lawsuit, an inference might be drawn that the attorney for Chicago Tents expected that his cooperation in selecting the jury would be reciprocated in some manner by the attorney for the plaintiffs during the course of the trial. Some such unspoken agreement does not establish a common interest on matters with which the jury is concerned.

■ As the present rule reads, however, it is the duty of the trial judge to equalize the number of peremptory challenges so that no *litigant* or side is given an unfair advantage as a result of the alignment of the litigants and the award of *peremptory* challenges to each litigant or side. The rule further provides that in determining how the challenges should be allocated, the court shall consider any mat-

ter brought to the attention of the trial judge concerning the ends of justice and the elimination of an unfair advantage.

This rule had not become effective at the time this jury was chosen. However, the new rule for the most part merely formalizes the rules previously announced in *Patterson Dental Co. v. Dunn,* 592 S.W.2d 914 (Tex.1979).

■ Nevertheless, the trial court correctly determined that the defendants were on the same side of the docket, and there is nothing in the record to indicate that Chicago Tents was interested in having the jury answer special issues in a way that would adversely affect the interest of H.L. & P. The trial court properly refused to award extra strikes to either side.

■ The real issue is whether or not a trial court erred in failing to reallocate the number of strikes between the defendants upon learning of the collaboration between Chicago Tents and the plaintiff. After listening to the evidence concerning the collaboration between Chicago Tents and the plaintiff, the trial court determined that the plaintiff was not given an unfair advantage by the award of three challenges to Chicago Tents. There is testimony to support this decision. Appellant's points one and two will not be sustained.

Special issue 12 reads:

Do you find from a preponderance of the evidence that the conduct of Houston Lighting & Power Company inquired about in this charge constituted a heedless and reckless disregard of the rights of others affected by it?

H.L. & P. contends that the trial court erred in submitting this issue, and special issue 13 concerning exemplary damages, "because: (a) it is undisputed that H.L. & P. complied with national and state standards regarding the lines in question; (b) there is no evidence of conscious indifference, or reckless disregard, on behalf of H.L. & P. toward Carl Reynolds."

■ Under some circumstances, punitive damages may be awarded in a product

liability case. *See Maxey v. Freightliner Corp.*, 722 F.2d 1238 (5th Cir.1984). In *Maxey*, the court followed the reasoning of *Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex.1981), saying that the test is not "whether the defendant exercised 'an entire want of care,' but rather is whether an inference of conscious indifference is raised."

Here the jury has found that the conduct of H.L. & P. exhibited such an entire want of care as to indicate that "the act or omission in question was the result of conscious indifference to the rights, welfare, or safety of the persons affected by it," and "constituted a heedless and reckless disregard of the rights of others affected by it."

The power lines were uninsulated and were installed through the backyards of a residential neighborhood. H.L. & P. knew of previous instances where injuries had been sustained by persons who contacted the power lines. The defendant warned its employees of the danger involved in their work near the high voltage lines. Warnings were posted around substations, steel towers on which high voltage lines were strung, and other installations, but there were no warning signs on the poles or lines in the residential subdivision where Carl lived. Posting such signs would not have had a substantial economic effect on H.L. & P.

There is evidence from which an inference of conscious indifference to the safety of the residents of the subdivision could be drawn. The trial court did not err in rendering judgment based on the answers the jury made to special issues 12 and 13. *See In Re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

The judgment rendered by the trial court was authorized by the jury findings in answer to issues submitted on the strict products liability cause of action. The contributory negligence finding does not require a reduction in the damages awarded. Tex. Rev.Civ.Stat.Ann. art. 2212a is not applicable. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414. The exemplary damage award is not based on gross negligence but, rather, on a finding of conscious indifference to the welfare of the plaintiff. Article 2212a does not require that the exemplary damages award be reduced by reason of the contributory negligence of the plaintiff. *Anderson v. Trent*, 685 S.W.2d 712 (Tex. App.—Dallas 1984, writ ref'd n.r.e.); *see, Pedernales Electric Cooperative, Inc. v. Schulz*, 583 S.W.2d 882 (Tex.Civ.App.— Waco 1979, writ ref'd n.r.e.).

The judgment is affirmed.

WARREN, Justice, concurring.

I concur in the result but dissent to the majority's holding that the evidence was insufficient to support the jury's negligence finding against appellant in special issue number four. In my opinion, the evidence supports a jury's finding of failure to warn, whether the case is tried under a theory of negligence or strict liability.

## MOTION FOR REHEARING

TOM COLEMAN, Retired Judge.

In their motion for rehearing appellees have asserted that "the Court of Appeals erred in failing to include in its judgment, prejudgment interest on those elements of damages, as found by the jury, to which appellee would be entitled to prejudgment interest."

The question of prejudgment interest was not presented to the trial court, or by cross-point in the briefs filed by appellees prior to submission of this cause.

This failure is understandable because prior to June 5, 1985, it was generally understood by the bench and bar of Texas that prejudgment interest was not recoverable in a personal injury case. On that date the opinion in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex. 1985), was rendered by the Supreme Court of Texas.

In *Cavnar* the Supreme Court held that "as a matter of law, a prevailing plaintiff may recover prejudgment interest compounded daily (based on a 365–day year) on

damages that have accrued by the time of judgment. Prejudgment interest shall accrue at the prevailing rate that exists on the date judgment is rendered according to the provisions of Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 sec. 2 (Vernon Supp.1985)."

The court also held that in non-death personal injury cases, "interest shall begin to accrue on both pecuniary and non-pecuniary damages from a date six months after the occurrence of the incident giving rise to the cause of action."

Finally, the court held that the law established by *Cavnar* applies "to all future cases as well as those still in the judicial process involving wrongful death, survival and personal injury actions."

■ This Court did not err in failing to include prejudgment interest in its judgment because it affirmed the judgment of the trial court before the question of prejudgment interest was raised by the plaintiffs. *See Allright, Inc. v. Pearson,* 711 S.W.2d 686 (Tex.App.—Houston [1st Dist.] 1985), where motion for prejudgment interest was allowed after submission and before the court's judgment. It is well settled that an appellate court will not reverse a judgment by reason of a matter that is not assigned as error in the brief of a party.

It is also settled law that questions not raised in the Court of Appeals on the original hearing may not be raised for the first time on the motion for rehearing unless fundamental error or jurisdictional points are involved. 5 Tex.Jur. (Third) sec. 573.

While this case is "still in the judicial process" and the rules of law established in *Cavnar* apply, the question yet to be answered is whether the Supreme Court intended to modify procedural rules to the extent necessary to afford prejudgment interest in cases tried to a judgment before the decision was announced.

■ The language "still in the judicial process" may well have been included to insure that the decision would apply to all cases on appeal in which the trial court refused to grant prejudgment interest and

the error was properly preserved. As a general rule where the appellees fail to except to a judgment or in any way inform the court of their dissatisfaction with the judgment entered, the complaint is waived. *Portwood v. Buckalew,* 521 S.W.2d 904, 922 (Tex.Civ.App.—Tyler 1975, writ ref. n.r.e.).

It has long been the rule that the right to recover prejudgment interest is waived if not asserted in the trial court. *National Moving and Storage, Inc. v. Vargo,* 501 S.W.2d 452 (Tex.Civ.App.—Amarillo 1973, writ ref'd n.r.e.). However, it has been held that the interest which an award bears after judgment is a creature of statute and is recoverable even if the judgment makes no reference to its recovery. *Trinity Portland Cement Division, General Portland Cement Company v. Coastal Industrial Water Authority,* 551 S.W.2d 76, 78 (Tex. Civ.App.—Houston [1st Dist.] 1977, rev'd on other grounds, 563 S.W.2d 916 (Tex. 1978); *Hoffman v. Love,* 523 S.W.2d 503 (Tex.Civ.App.—Amarillo 1975, no writ).

■ It may be that the Supreme Court intends that the rule of law applicable to statutory post judgment interest be applicable also to prejudgment interest. *See, Allright, Inc. v. Pearson,* 711 S.W.2d 686 (Tex.App.—Houston [1st Dist.] 1986). Nevertheless, it is the opinion of this Court that we lack authority to reform the judgment of the trial court on a point of error presented for the first time in a motion for rehearing.

The other point presented in appellees' motion for rehearing raises no new matter. Appellees' motion for rehearing is denied.

Appellant has also filed a motion for rehearing which presents no new matter. The motion is denied.