MARTIN ET UX. *v.* THE ARUNDEL CORPORATION ET AL.

[No. 139, September Term, 1957.]

*Decided March 27, 1958.*

*Motion for rehearing filed and denied, April 25, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*William Graham Boyce, Jr.,* with whom were *Musgrave, Preston & Boyce* on the brief, for the appellants.

*J. Gilbert Prendergast,* with whom were *F. Duncan Cornell, Clark, Smith & Prendergast,* and *Tydings, Sauerwein, Benson & Boyd* on the brief, for the appellees.

HORNEY, J., delivered the opinion of the Court.

Charles Martin, Jr., and his wife, Jane C., (the Martins), sued the Arundel Corporation, (Arundel), in the Superior Court of Baltimore (Sodaro, J.) to recover damages for several annoyances and physical damage to their property allegedly arising out of the operation of a quarry in the neighborhood. Before trial, the Martins amended their cause of action to include a similar claim against Arundel-Brooks Corporation, (Arundel-Brooks), a wholly-owned subsidiary of Arundel. At the close of all the evidence, the court directed a verdict in favor of Arundel-Brooks. The claim for damages against the other party defendant was submitted to the jury and resulted in a verdict in favor of Arundel. From the judgments entered on the two verdicts against them, the Martins appealed.

There had been a large quarry in the Woodberry section of Baltimore City for more than fifty years. The prior owner, who had operated the quarry for a long time, sold it in 1938 to Arundel, which has owned and operated it ever since. In 1937 the Martins had purchased for $1,800 an old shingle house, located at the corner of Rockrose and Hooper Avenues, south of the quarry. It had been vacant for some time and was in bad condition. The Martins repaired the windows, made other minor improvements and moved into the house. They painted the inside walls eight years before the trial, but did not paint the exterior trim until two years before. There never had been any major repairing or replacing of windows and plastering in the nineteen years the Martins had lived in the house. There was testimony that they had recently refused $10,000 for the house. The entire area in the vicinity of the quarry, includ-

ing the Martins' house, is zoned second commercial, and there are several industrial and manufacturing plants nearby.

In the action against Arundel, the Martins alleged several different kinds of nuisances resulting from the operation of the quarry for which they sought damages. The facts as to each type are summarized briefly:

1. *Damage from Blasting:* The site of the blasting, inside the quarry, was about a quarter of a mile from the Martins' house. Several neighbors, as well as the Martins, testified that on some occasions, blasts could be felt in houses located at different places along Rockrose Avenue, that the buildings would vibrate and "tremble", and that window panes would rattle, but none broke. The Martins claimed that the walls of their house were badly cracked, that loose plaster fell and damaged the floors, and that cracks occurred in the stone foundation. The Martins complained to the City authorities. As a result an explosives inspector of the Highway Department made an investigation. He concluded that the loads of dynamite used were not excessive, and that the blasting methods conformed in every respect to the prescribed techniques of safety and with the City's requirements. Arundel denied that the blasting either did or could cause damage to the Martins' house. A seismologist made various tests inside the house when heavy charges of dynamite were detonated. He found slight vibration, far below the minimum needed to cause damage to plastered walls, and not enough to cause other damage. The trial court, pursuant to Maryland Rule 550 (Jury—Inspection By) permitted the jury to make an inspection of the house and premises.

2. *Damage from Dust:* From time to time Arundel had deposited screenings from the crusher in an open field on the quarry property. Eventually, the screenings grew into a sizeable mound estimated to be 40 or 50 feet high. The Martins complained that the wind blew the loose dust and stone particles from the pile and caused it to settle on their property. The husband testified that the dust was so bad he could not sit on his porch or open the windows. His wife testified that the dust made living conditions "absolutely horrible", "unhealthy" and "absolutely unbearable". In 1952, the Martins

complained about the condition to the City authorities. A qualified sanitarian of the City Health Department investigated. He observed dust in the area of the Martins' house, but he could not determine the source exactly. He did not see any dust emanating from the mound of screenings. But he recommended to Arundel that the mound be sprayed with a sealing chemical. Arundel promptly complied. According to the sanitarian, conditions in the neighborhood were satisfactory after the spraying. The jury had an opportunity to observe conditions on its visit to the premises.

3. *Damage from Noise:* The Martins testified that they were disturbed at night and at other times by noise coming from the crusher inside the quarry and from several diesel trucks known as "Euclids". Arundel denied that its equipment created undue noise or that it could possibly disturb even sensitive neighbors because of the distance from the house to the scene of operations, and because of the hills surrounding the quarry on three sides. The jury likewise had an opportunity to observe the quarry in full operation on its excursion to the area.

4. *Damage from Operation of Concrete Trucks:* Arundel-Brooks operates a concrete-mixing plant at the quarry. Trucks of customers came to the plant empty and left loaded with a wet concrete mixture. At times, Arundel-Brooks made direct deliveries to customers outside the quarry in its company-owned "agitator" type trucks. In this type of trucks the ingredients are sealed inside of a slowly-revolving container mounted on the truck in which the concrete is mixed in transit to its destination. The Martins contended that the company-owned trucks (i) made a great deal of noise as they passed their house, (ii) caused dust to rise from the bed of Rockrose Avenue, and (iii) sometimes dropped wet concrete on the streets. Most of the evidence produced by the Martins with regard to spillage of concrete is either silent or ambiguous on the issue of *whose* trucks caused the "damage" complained of—the trucks of Arundel-Brooks *or* the trucks of its customers. Only one witness testified that she saw some spillage from Arundel-Brooks trucks, but said

that "it isn't very often". On the contrary, the superintendent in charge of the company-owned trucks denied that any concrete had ever been spilled from its trucks because they were equipped with mechanical devices to prevent spillage. The Martins never complained to Arundel-Brooks about spillage, and there was no proof that spillage of concrete along Rockrose Avenue ever caused them any *actual* damage. For a long time the bed of Rockrose Avenue was a rough, dusty, "semi-paved" road. As trucks drove along it, there were times when dust from the highway would be stirred up. The City failed to pave the bed of the street until 1954 or 1955. There was no evidence that Arundel-Brooks was ever responsible in any manner for the maintenance of the streets in the area.

Several reasons are assigned as to why the judgments should be reversed. In addition to the contention that the trial court erred when it granted the motion for a directed verdict in favor of Arundel-Brooks, the Martins contend that the court committed reversible error in its rulings on three separate matters of evidence, and finally, that the court committed reversible error with respect to its instructions to the jury.

We will consider the matter of the directed verdict in favor of Arundel-Brooks first. The Martins contend that the question of the liability of Arundel-Brooks for damages should have been submitted to the jury. We find no merit in this contention. There was only the evidence of one witness as to some spillage of concrete on a public street, which did not happen often, and there simply was no proof of any damage done to the Martins by Arundel-Brooks. The statement in *Prosser, Torts* (2d ed. 1955), at p. 395, that "the law does not concern itself with trifles, or seek to remedy all of the petty annoyances and disturbances of every day life in a civilized community," is quite appropriate here.

We will next consider the rulings on the evidence which are pertinent. The Martins contend: (i) that the trial court struck out all testimony pertaining to the operation of the quarry and the damage allegedly resulting from such operation which occurred more than three years prior to the date

suit was filed; (ii) struck out all testimony of complaints of witnesses other than the Martins, and refused to permit a witness for Arundel to be cross-examined as to complaints made to it; and (iii) refused to permit the Martins to read on cross-examination the deposition of a witness for Arundel.

(i)

On the limitations question, it is essential to bear in mind that the statute does not render inadmissible evidence of a nuisance occurring more than three years before the commencement of the action so long as such evidence is restricted to the question of *liability*. But such evidence must not be considered by the jury on the question of *damages*. *Morrow v. Florence Mills,* 181 N. C. 423, 107 S. E. 445 (1921). Damages may be awarded only on evidence occurring within the period of limitations. The same distinction is pointed out in *City of Lawton v. Schwarz,* 128 Okla. 42, 261 P. 140 (1927).

The case of *Aberdeen v. Bradford,* 94 Md. 670, 51 A. 614 (1902), is a leading Maryland authority for the proposition that a jury, in estimating *damages* sustained by a plaintiff as a result of some unlawful action on the part of a defendant, is only allowed to consider evidence of what occurred within three years from the time the suit was instituted, but it should be observed that in the *Aberdeen* case the plaintiff's fifth prayer was based on the presumption that the jury had already found a verdict in favor of the plaintiff. The three-year limitations concerned only the question of damages. In other words, when the jury was deliberating the initial question of *liability* or *no liability,* it was at liberty to consider matters of evidence occurring more than three years before suit was filed. The exclusion of evidence became necessary only when the jury considered the question of *damages.* This Court undoubtedly had the same distinction in mind in *Botelar v. Bell,* 1 Md. 173 (1852), a slander action, when it said: "The statute of limitations does not apply to *evidence,* but to the *cause of action."* There the Court held that utterances made more than one year before suit were admissible. See also *Consolidated Public Utilities Co. v. Baile,* 152 Md.

371, 136 A. 825 (1927), in which recovery for seepage of water into the plaintiff's building was limited to damages sustained within three years prior to suit. A similar holding was made in *Mayor & City Council of Baltimore v. Merryman*, 86 Md. 584, 39 A. 98 (1898). For the same rule of limitations on damages in other jurisdictions, see *Cincinnati, N. O. & T. P. Ry. v. Roddy*, 132 Tenn. 568, 179 S. W. 143 (1915), and *Lentz v. Carnegie Bros.*, 145 Pa. 612, 23 A. 219 (1892).

After all of the evidence was in, Judge Sodaro informed counsel—and subsequently advised the jury—that he was striking out all testimony pertaining to the operation of the quarry which had taken place three years or more prior to the filing of the suit, *i. e.*, prior to December 30, 1951, the suit having been filed on December 30, 1954. Technically, of course, the trial court should not have stricken out this testimony. Instead the court should have instructed the jury that it was proper for it to consider such testimony—along with the testimony pertaining to the operation of the quarry after December 30, 1951—on the issue of the liability of Arundel, but that it should disregard all testimony pertaining to quarry operations before December 30, 1951, in assessing damages *if* it found for the Martins. However, the error was harmless. This case was tried in February of 1957. The legally admissible evidence that was stricken out related to matters which had occurred before December of 1951. The evidence that was not stricken pertained to alleged nuisances which had occurred between December of 1951 and February of 1957, a period of over five years. Moreover, such of the evidence as was stricken concerned the operation of the quarry, not evidence concerning the *condition* of the Martins' house. A thorough examination of the record shows that there were only a few references to the operations of the quarry before December of 1951. In none of those references was there any indication of unusual conditions affecting Arundel's liability for damages. Nor was there any mention that conditions prior to December of 1951 were either different in kind or greater in magnitude than those which occurred thereafter. Indeed, according to the uncontradicted

testimony, conditions worsened after the end of the year 1951. A perusal of the record creates a distinct impression that practically all of the testimony relates to more recent matters, that is, those occurrences which were still distinct in the minds of the witnesses. Naturally there was a minimization of the more remote conditions, and those which were mentioned were relatively immaterial as previously indicated.

The judgment entered on the jury's verdict for the defendant should not be reversed when it is apparent that the striking out of relatively immaterial evidence, previously admitted on behalf of the plaintiffs, was no more than a harmless error.

### (ii)

On the striking out of the complaints made by persons other than the Martins, it is important to observe that the trial judge did not strike out any testimony regarding the *effect* of Arundel's operations on other witnesses, but struck out of the *evidence* only the *complaints* made by such witnesses to Arundel on their own behalf. This was proper. The case of *Baltimore Belt R. R. v. Sattler,* 100 Md. 306, 59 A. 654 (1905), is in point. In that case the witnesses, who lived in the same neighborhood as the plaintiff, were permitted to testify as to the *effect* on them of the smoke from the defendant's locomotive. But they did not testify as to any *complaints* that they had made to the railroad company. See also *Doyle v. Manhattan Ry.,* 128 N. Y. 488, 28 N. E. 495 (1891), and *Cooper v. Randall,* 59 Ill. 317 (1871), in which evidence of the *effects* on witnesses was permitted.

### (iii)

On the admissibility of a deposition as evidence, the rules of this Court are clear. Maryland Rule 413 a 2 (Use of Deposition) does state that: "The deposition * * * of any one who at the time of taking the deposition was an officer * * * of a * * * private corporation * * * which is a party may be used by an adverse party *for any purpose.*" (Emphasis added). But that does not mean that the rules of evidence may be ignored. Necessarily, there must be a legitimate purpose in the use of the deposition as there must be a lawful purpose in the offering of other evidence. Gene Donald

Schaub, an assistant-secretary of Arundel, was asked two limited questions on direct examination. On cross-examination the Martins sought to read the whole deposition of the corporate officer into the evidence. Of course, the deposition could have been used for the purpose of contradicting or impeaching the testimony of the witness or any other officer or director of the corporation on matters pertaining to the corporation's business. The trial court offered counsel for the Martins an opportunity to use the deposition for any proper purpose permitted by the rule, but counsel declined to do so. The deposition was never formally offered in evidence. Instead, when counsel persisted in asking the witness questions wholly unrelated to the answers made in response to the direct examination, the court suggested that counsel make the corporate officer his witness. He did, but he asked him only a few questions concerning certain seismographic tests that had been made by Arundel—a matter which was not referred to in the deposition. There is not the slightest doubt that the Martins were not entitled to read the whole deposition into the record without regard to the rules of evidence. If any part of the deposition was admissible in evidence, it could have been admitted, but it was incumbent upon the Martins to point out the specific parts which they believed were material and therefore admissible. *Berkshire v. Harem,* 181 Ore. 42, 178 P. 2d 133 (1947). See also *Wulferdinger v. Pickwick Stages System,* 105 Cal. App. 509, 288 P. 93 (1930), and *Bradley v. Wabash R. R.,* 227 S. W. 2d 93 (Mo. App. 1950).

Finally, there is the question with regard to the court's instructions to the jury. The only objections made by the Martins to the court's instructions were directed to the refusal of the court to grant the nine prayers offered by them. Aside from the omission of an adequate instruction with respect to the testimony erroneously stricken out, (referred to in "i" above), we think that the instructions requested by the prayers insofar as they were proper—excepting, of course, the action against Arundel-Brooks already disposed of—were fairly covered by the instructions actually given by the court. But in other respects the instructions were far more than the

Martins were entitled to under the law of evidence applicable to the facts in this case. While the instructions touched upon the locality and the surrounding circumstances, the court did not elaborate on the fact that a party dwelling in an area zoned second commercial cannot claim the same peace and quiet and freedom from vibration, dust and noise and other annoyances that he might rightfully claim if he resided in an area zoned residential. See *Dittman v. Repp,* 50 Md. 516, 522 (1879), and *Washington Cleaners v. Albrecht,* 157 Md. 389, 395, 146 A. 233 (1929). Since the Martins assigned no specific grounds of objection, other than the refusal of their prayers, already disposed of, there is nothing further for this Court to consider with respect to such instructions. See Maryland Rule 554 e (Instructions to the Jury—Appeal).

*Judgments affirmed, the appellants*
*to pay the costs.*