ANNE ARUNDEL COUNTY, MARYLAND *v.* ROBERT LITZ ET UX.

[No. 609, September Term, 1979.]

*Decided April 9, 1980.*

---

The cause was argued before GILBERT, C. J., and THOMPSON and LOWE, JJ.

*John M. Court, Assistant County Solicitor,* with whom was *Richard Lazer Hillman, County Solicitor,* on the brief, for appellant.

*Vincent A. Mulieri* for appellees.

THOMPSON, J., delivered the opinion of the Court.

Anne Arundel County, the appellant, complains on a number of grounds hereinafter set out, that Judge Raymond G. Thieme, Jr., the chancellor, committed error in granting an injunction restraining it from any further pollution of the lake owned by Robert Litz and wife, the appellees. The appellees also appeal complaining as to the form of the injunction and the failure to award damages.

## I Facts

The appellees acquired the subject property in Lakeland, near Severna Park, Maryland on June 18, 1959 by deed from Bernard J. Lee, Jr. and Rosalie W. Lee, his wife. The property consisted of approximately 15.1 acres, including a spring fed lake of some 3 acres.[1] On June 27, 1962, the appellees conveyed 8.685 acres of the land to Lake Forest, Incorporated, together with the right to use the lake. The land so conveyed was developed into a subdivision of lakefront homes, known as Lake Forest. As development on the north side of Benfield Road increased drainage problems developed on Benfield Road, so in September of 1964, Anne Arundel County, the appellant, purchased an easement from Raymond D. Kittinger and Ruth Kittinger, his wife, to construct and maintain storm water facilities through the Kittinger property from Benfield Road to the head of a ravine, which leads to the lake. The appellant installed an 18″ drainage pipe in said easement to drain water into the lake.

The appellees and the Lake Forest Community Association became concerned in 1968 about erosion and potential damages to the lake caused by the collection of surface water through the 18″ pipe. The appellees and the Association had many discussions and meetings with appellant's representatives over the issue. In late 1969 or early 1970, Mr. Litz learned the appellant planned to improve Benfield Road and also make the improvements in

---

1. Although this statement of fact is challenged by the appellant, it was so found by the chancellor.

the easement across the Kittinger land to the lake. Mr. Litz voiced his concern, and as a result, the appellant directed Messick and Associates, its consulting engineers on Project 761-R, to study the problem. Messick produced the study known as the "Kittinger Storm Drain Outflow Study", dated August 1970, which stated that a closed system would alleviate the appellant from any responsibility regarding siltation of the existing lake. Messick, nonetheless, recommended against changing its original design and the appellant agreed.

The project known as 761-R relocated and widened Benfield Road and changed the drainage pipes in the area. To prepare for the construction of the new drainage system called for in the plans, the appellant purchased an additional easement from the Kittingers. This second easement began at the end of the first easement and extended to the lake. The 18″ pipe was replaced by a 36″ pipe and the pipe system in the roadway was upgraded to accommodate increased amounts of surface water generated by surrounding development and the widening of the roadway. In addition, concrete baffles were constructed in front of the 36″ pipe in an attempt to slow the velocity of the water exiting the pipe. A series of three check dams was also installed in an attempt to further slow velocity and trap sediment. Installation of the 36″ pipe and improvements in the said easement were started on September 16, 1970 and completed on or about November 1, 1971.

On August 31, 1971, the Lake Forest Community Association filed suit against Anne Arundel County, Maryland, for injunctive relief and damages. When the suit by the Association did not proceed, the appellees filed this suit on February 6, 1974. They sent notice to the County pursuant to Article 57, Section 18 of the Maryland Code on January 31, 1974, the same being received by the County Council on February 4, 1974.

## II Parties

The appellant first contends that necessary parties were omitted from this suit in which appellees seek an injunction

preventing the appellant from collecting unreasonable amounts of surface water and channelizing it onto the appellees' property as well as damages from prior acts. The claimed necessary parties were the Soil Conservation Service, the Department of Natural Resources, and the other property owners in the watershed. The chancellor was not impressed with appellant's argument nor are we. The allegations and the evidence showed that the appellant was the only party who had channelized the water and caused it to damage the appellees' property. Although other property owners may be contributing to the run-off, there is no allegation nor evidence to suggest that they were anyway involved in the unreasonable collection of surface water or channelization of the water over the appellees' property. It is up to the appellant to secure whatever permits from public bodies that may be necessary to correct its prior improper actions.

### III Appellant's Right to Use the Lake

The appellant contends it has the right to use the lake in any manner it sees fit by virtue of a quit claim deed from Raymond D. Kittinger and Ruth W. Kittinger. This contention stands or falls by virtue of the terms of a conveyance to the Kittingers from Frances C. Perkins dated October 13, 1943. That deed conveyed "the right to use the waters of the lake ... solely and only to the said parties of the second part, and their heirs ...." The County argues that the word "heirs" is a word of limitation indicating the grant, in fee simple, of a perpetual, transferable, exclusive easement in the lake. The appellees contend that "heirs" is a word of purchase and that a non-exclusive easement was granted only to the Kittingers and their heirs.

The word "heirs" has been given a technical legal meaning as a word of limitation. When the word is used, it is presumed to be a word of limitation unless it is shown that it was used to designate particular persons. *Lobe v. Goldheim,* 153 Md. 248, 250, 138 A. 5 (1927). *Gardner v.*

*Gardner,* 25 Md. App. 638, 335 A.2d 157, *cert. denied,* 275 Md. 748 (1975), quoting 26 C.J.S. *Deeds* § 124 (1956), said:

"The term 'heirs' is a technical term, clothed in the law of real property with a special significance. It may, however, be used in a deed as a word of limitation or as a word of purchase, according to the grantor's intent, which is to be determined from an examination of the entire instrument. When used technically the term 'heirs' is one of limitation, and unless an intention to the contrary appears, it will be presumed to have been used in its technical sense as a word of limitation." *Id.* at 644.

In determining the intent of the grantor, the whole instrument is to be considered in light of the facts and circumstances surrounding the transaction. *Green v. Eldridge,* 230 Md. 441, 447, 187 A.2d 674 (1963).

Examining the instrument as a whole reveals that the word "heirs" is used in several other places. With the exception of paragraph "B" the word "heirs" is used in conjunction with the word "assigns". In two places, "heirs and assigns" is followed closely by "in fee simple". The chancellor disposed of this contention on this basis as well as on other grounds, with all of which we entirely agree. A portion of the chancellor's opinion follows:

"The Court concludes from this that the deed was very carefully drafted by someone who knew the significance of these words. In those places where a description of the interest conveyed was appropriate, the granting clause and the habenden clause, the draftsman took great pain to make it perfectly clear that a fee simple was intended. In paragraph 'B' 'heirs' seems to be used in an entirely different way. In the same sentence as the grant to the Kittingers, '... and their heirs', Frances Perkins secures the right to consent to a transfer of a portion of the property to herself 'or her heirs' for so long as she 'or her heirs' owns any portion of the

tract. The word 'heirs' in regard to Frances Perkins could not have been intended to be used in the technical sense as words of limitation because no conveyance was being made to her. For the sake of consistency within the same sentence, therefore, it would seem that 'heirs' in regard to the Kittingers is a word of purchase. This result is logical if the words 'solely and only' are read to limit the class of grantees rather than designate the interest passed.

"The facts and circumstances surrounding the transaction also lead to the conclusion that the intention of the grantor was to convey a non-exclusive easement to a limited class of grantees. At the time of the conveyance to the Kittingers, Frances Perkins still owned the remainder of the original tract including the bed of the lake. It seems incongruous for her to retain the bed of the lake for herself yet convey away the exclusive right to use the lake making her fee in the lake worthless. Not being able to assure the right to use the lake would certainly lessen the value of the remaining portions of the tract that she later intended to sell. The second part of the clause granting the easement shows a concern on the part of Frances Perkins as to who was to occupy or own the land near the lake as long as she or her heirs owned any portion of the tract. It appears inconsistent with this concern to convey a fully transferable interest in this land to other parties. To read the deed in such a way would be to say that in the same sentence, she conveyed away all rights to choose the parties to use the lake and yet kept the right to approve the parties living on the lake. Use of the lake is also mentioned in the description of the property following the language of fee simple grant. However, this is a portion of the description of the 'two lots of ground' rather than the fee simple grant of an easement.

"For the reasons stated above, the Court finds

that the easement granted was not transferable to parties other than heirs of the Kittingers. However, there is another reason which defeats the County's claim of an easement to use the lake. The Kittingers' interest consisted of an easement appurtenant. An easement appurtenant is one which benefits a particular parcel of land. *Greenwalt v. McCardell,* 178 Md. 132, [12 A.2d 522] (1940); 3 Powell, *Real Property,* § 418 (1978). While an easement appurtenant is an incident of, and passes with, possession of the dominant estate, there is nothing to prevent a grantor from providing that the easement will *not* pass to the transferee of the dominant estate. *Restatement of Property,* comment b to § 487. Even if it were found that the easement was transferable to the grantees of the Kittingers, the County's position would not be improved. The Kittingers could not convey their easement separate from the land. An easement appurtenant is annexed to the *possession* of the dominant estate and cannot be severed from it. 3 Powell, *Real Property,* § 418. The County's interest in the Kittinger land consists of an easement for a drainage course and an easement is a nonpossessory interest.

"Even if it were found that the County had the easement it claims, the use being made of it is clearly excessive. The owner of the dominant estate is entitled to use the easement only in the manner contemplated by the grant. *Millson v. Laughlin,* 217 Md. 576, 585 [142 A.2d 810] (1958). The grant is for the use of the waters of the lake. There are several possible uses of the waters of a lake but dumping silt onto the lake bottom is not one of them. An easement is a right of use and cannot be construed to permit such destruction of the underlying fee of the servient estate as is shown by the evidence. Also, the County has channeled runoff from a large adjacent area into the lake. An

easement appurtenant cannot be used to benefit land other than the dominant estate. *Buckler v. Davis Sand and Gravel Corp.,* 221 Md. 532, [158 A.2d 319] (1960)."

## IV Appellees' Title

Under this heading, appellant contends the appellees, the Litzes, failed to establish their title to the bed of the lake. The chancellor found otherwise and we agree.[2] Another portion of the chancellor's opinion follows:

"The County has questioned the standing of the Plaintiffs to bring this action by attacking the validity of their title. . . .

"The problem in the Litz chain of title stems from an ambiguity in the 1950 deed from James J. Perkins to Eloise Garrison. The calls at issue read as follows:

'. . . thence continuing the same course, North 85 degrees 12 minutes East, and passing through a blazed Oak Tree, 331 feet, more or less, to a point at the head of a lake, thence with the third line of a deed from Frances Perkins to Raymond Kittinger, dated October 15, 1943 and recorded among the said Land Records in Liber J.H.H. 293, folio 131, along approximately the West edge of said lake, South 34 degrees 03 minutes East, 791 feet, more or less, to a pipe set at the edge and at the Southeast corner of said lake.'

"The Kittinger line runs along the east edge of the lake (Exhibit 1G) thus the Garrison boundary could not have run both with the Kittinger line and with the west edge of the lake. The Court must determine from the evidence presented which of these two designations prevails. There are

---

**2.** There is no contention that the lake bed is owned by the State of Maryland.

established rules of preference as to conflicting calls yet these are only guides to determining the intention of the parties. *Dundalk Holding Co. v. Easter,* 195 Md. 488, 495, [73 A.2d 877] (1950). The description given calls first to an existing monument, the Kittinger line. Calls to monuments, natural or artificial prevail over courses and distances and the line of an adjacent tract, if known, can be a monument. *Dundalk Holding Co. v. Easter, supra.* The Court determines that giving preference to the call to the Kittinger line is in accord with the intent of the parties to this instrument. In determining the intent, the whole instrument is to be considered in light of all the facts and circumstances of the transaction. *Green v. Eldridge,* [supra]. The remainder of the description of that boundary calls to South 34 degrees 03 minutes East. This is the approximate direction of the *East* shoreline of the lake and the Kittinger line but is far from the direction of the West shoreline. In addition, the Perkins family eventually conveyed all of the land around the lake (Watson deed, Exhibit 1H and Wagner deed Exhibit 1J). None of these deeds convey the bed of the lake. To construe this boundary as running along the west edge of the lake would leave the title to the bed of the lake in James Perkins with no reservation of access, a result which was surely not intended. The Garrison property was also the logical parcel to include the lake as it was the parcel upon which the Perkins family actually lived. From the examination of the entire instrument and the facts and circumstances surrounding the transaction, the Court concludes that it was the intention of the parties that the boundary of the Garrison property (now the Litz parcel) was intended to be the east edge of the lake and that the designation of the west edge was an error. Therefore, the Plaintiffs have both color of title and sufficient standing to bring this action."

## IV Evidence

Appellant argues that because its experts testified the efforts made by the County to correct the drainage problem were the optimum that the state of the art permitted, the chancellor was in error in finding to the contrary.[3]

The appellant, by its construction of the project known as 761-R is collecting and channelizing and thus concentrating and artifically increasing the volume of surface water through the pipe system and discharging same into its easement where it carries silt into appellees' lake. Aerial photographs of the lake taken in April of 1970 do not reveal the presence of the sandbar at the end of the appellees' easement, at the northern end of the lake, while such photographs taken in 1977 show clearly the presence of the sandbar positioned exactly at the end of appellees' easement. The sandbar grew from 2,480 square feet in 1975 to 6,600 square feet in 1978. Where the lake was, in 1960, 15 feet deep in the center, it is now 9.3 feet deep. See Baer v. Board of County Commissioners, 255 Md. 163, 257 A.2d 201 (1969) in which the municipality extended a drainage pipe to the rear of Baers' lot where it discharged. There the Court stated:

> "The Baers are obviously correct when they say that this concentrated water on their lot which they might never have been required to take had the pipes not been installed. The fact that the direction of flow may have been left undisturbed is not the controlling circumstance; it is the fact that the County canalized the water in pipes which were by their very nature impervious, so that the Baers were deprived of the natural process of absorption and diversion which might have taken place had the water flowed across the surface of Beyard's lot." Id. at 170.

We see no error in the chancellor's findings on this issue.

---

3. The report on Project 761-R showed that the problem could have been avoided by extending the pipe into the Severn.

## V Form of Injunction

The appellees complain because the injunction did not require the appellant to remove the pipes or to extend the pipes to a suitable place of discharge, contending that the appellant could satisfy the order simply with cosmetic changes, citing *O.F.C. Corporation v. Turner,* 228 Md. 105, 179 A.2d 366 (1962), *Md. Trust Co. v. Tulip Realty,* 220 Md. 399, 153 A.2d 275 (1959). We are impressed by the chancellor's statement that he believed it was not his function to require any particular course of action by the appellant but that the handling of the problem should be left to its discretion so long as the end result was accomplished. The granting or denying of an injunction is always within the discretion of the chancellor. *State Department of Health & Mental Hygiene v. Baltimore County,* 281 Md. 548, 554, 383 A.2d 51, 55 (1977), *Anne Arundel Co. v. Whitehall Venture,* 39 Md. App. 197, 200, 384 A.2d 780, 783 (1978). This is also true with reference to the form in which the decree takes. On this issue, although we are not sure whether the County's suggested action will remedy the problem, we will defer to the chancellor's discretion.

## VI Damages

The trial judge refused to grant the appellees damages because of their failure to give proper notice pursuant to *Md. Code,* Art. 57, § 18.[4] Appellees argue that the statute does not apply to continuing and continuous invasions of property as were present in this case. Although a cause of action for a continuous injury is not cut off by the limitations period, damages for recovery in cases where there is a continuous invasion have been limited by the statutory period. *See Shell Oil Company v. Parker,* 265 Md. 631, 291 A.2d 64 (1972); *Martin v. Arundel Corp.,* 216 Md. 184, 140 A.2d 146 (1958); *Consolidated Public Utilities Co. of Westminster v. Baile,*

---

4. The successor to this statute is in Courts and Judicial Proceedings § 5-306. Art. 57, § 18, in effect at the time the suit was filed required that the county be given notice of a claim within 180 days after the injury or damage was sustained. As the damages sustained were continuing in nature, it is not relevant that the pipe was installed in 1971, at which time the notice provision in Art. 57, § 18 was 90 days.

152 Md. 371, 136 A. 825 (1927); *Commissioners of Aberdeen v. Bradford*, 94 Md. 670, 51 A. 614 (1902). Thus, in this case, appellees could only recover for damages occurring 180 days prior to giving notice.

This holding is supported by cases interpreting Art. 57, § 18. The purpose of the notice provision is to have the claimant furnish the municipal body with sufficient information to permit it to make an investigation in due time sufficient to ascertain the character and extent of the injury and its responsibility in connection with it. *Jackson v. Board of County Commissioners*, 233 Md. 164, 168, 195 A.2d 693, 695 (1963). The notice is a condition precedent to the right to maintain the suit. *Madore v. Baltimore County*, 34 Md. App. 340, 342, 367 A.2d 54, 56 (1976). *See also, Cotham v. Board of County Commissioners*, 260 Md. 556, 273 A.2d 115 (1971).

The rule that damages may be limited to the notice period under the statute is supported by cases from other jurisdictions. In *Thomann v. City of Rochester*, 256 N.Y. 165, 176 N.E. 129, 130 (1931), Judge Cardozo, in interpreting a statute which required notice to be given to the municipality within thirty days, stated:

> "[The landowner] did not lose the right to some measure of relief by failing to give notice within the term of thirty days. What he lost was the right to include in the relief an award of damages antedating by more than thirty days the presentation of the notice in the statutory form."

*See also, Doran v. Town of Cheektowaga*, 54 App. Div. 2d 178, 388 N.Y.S.2d 385 (1976).

> *Decree affirmed except as to denial of damages.*
> *Case remanded for determination of the amount of damages.*
> *Appellant to pay the costs.*