558 A.2d 419

The **SINGER COMPANY, LINK SIMULATION SYSTEMS DIVISION**

v.

**BALTIMORE GAS AND ELECTRIC COMPANY.**

No. 741, Sept. Term, 1988.

Court of Special Appeals of Maryland.

June 5, 1989.

462

James A. Dunbar (Jeffrey A. Dunn and Venable, Baetjer & Howard on the brief), Baltimore, for appellant.

Laurie R. Bortz, Baltimore, for appellee.

Argued before GARRITY, KARWACKI and WENNER, JJ.

GARRITY, Judge.

We shall decide whether electricity remaining in a utility company's distribution system prior to being transformed into a useable state by passing through a customer's electric meter falls within the classification of "goods" to which the Uniform Commercial Code (UCC), Title 2 of the Maryland Commercial Law Code Annotated is applicable. We shall also examine the application of the statute of limitations to common law breach of contract and negligence claims which are based upon successive interruptions of a utility company's service to a customer. Finally, we shall determine the extent to which a utility company is liable for service interruptions when a provision of its service tariff exempts the company from liability for any such interruption which is not due to "willful default or neglect" on the utility's part.

The action giving rise to these questions was initiated on June 7, 1987, when the appellant, the Singer Company, Link Simulation Systems Division (Singer), filed suit in the Circuit Court for Howard County against the appellee, the Baltimore Gas & Electric Company (BG & E), asserting causes of action for (Count I) common law breach of contract; (Count II) breach of the UCC implied warranty of merchantability; (Count III) breach of the UCC implied warranty of fitness for a particular use; (Count IV) negligence in the supply of electric power; (Count V) negligent repair; and (Count VI) gross negligence. Singer's claims were premised upon various power outages it had experienced at its place of business from June 8, 1984 through September 9, 1986.

BG & E responded to Singer's complaint by moving to dismiss, or in the alternative, for summary judgment with respect to all counts raised in the complaint. The circuit court (Sybert, J.) dismissed Singer's UCC implied warranty claims and ruled that BG & E was entitled to judgment on the common law contract and negligence counts as a matter of law.

## Standards of Review

As a threshold matter, we address our role in reviewing the circuit court's granting of BG & E's motion.

Singer's UCC implied warranty claims were disposed of on a motion to dismiss. Under Md. Rule 2–322, a motion to dismiss for failure to state a claim serves the same function as a demurrer under former Rules 345 and 371b. *Sharrow v. State Farm Mutual Automobile Insurance Co.*, 306 Md. 754, 768, 511 A.2d 492 (1986); *Broadwater v. State*, 303 Md. 461, 466–67, 494 A.2d 934 (1985). Consequently, in considering the propriety of the trial court's order dismissing Singer's causes of action for breach of UCC warranties, we must assume the truth of all well-pleaded facts in Singer's complaint, as well as inferences which may reasonably be drawn from those well-pleaded facts. *See Wimmer v.*

*Richards,* 75 Md.App. 102, 105, 540 A.2d 827, *cert. denied,* 313 Md. 506, 545 A.2d 1344 (1988).

Summary judgment was entered in favor of B G & E with respect to Singer's common law contract and negligence counts. A grant of summary judgment is appropriate only where the moving party demonstrates the absence of any genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. Md.Rule 2–501(a). *See Dietz v. Moore,* 277 Md. 1, 4, 351 A.2d 428 (1976); *DeGroft v. Lancaster Silo Co.,* 72 Md.App. 154, 159, 517 A.2d 786 (1987); *Castiglione v. Johns Hopkins Hospital,* 69 Md.App. 325, 332, 527 A.2d 1316 (1986), *cert. denied,* 309 Md. 325, 523 A.2d 1013 (1987). A fact is "material" if it somehow affects the outcome of the case. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985). The court, in ruling on a motion for summary judgment, must consider the pleadings, depositions, answers to interrogatories, admissions and affidavits submitted by the parties. Md. Rule 2–501(e). In determining whether to grant summary judgment, the trial court must view all disputed facts and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made. *DiGrazia v. County Executive,* 288 Md. 437, 445, 418 A.2d 1191 (1980); *Honaker v. W.C. & A.N. Miller Dev. Co.,* 285 Md. 216, 231–32, 401 A.2d 1013 (1979); *Barb v. Wallace,* 45 Md.App. 271, 275, 412 A.2d 1314 (1980). Consequently, in reviewing the trial court's grant of B G & E's motion for summary judgment with respect to Singer's common law contract and negligence claims, we must also decide whether there is a genuine dispute as to any material fact, with inferences drawn in favor of Singer, and whether B G & E is entitled to judgment as a matter of law. *See Brady v. Ralph Parsons Co.,* 308 Md. 486, 496, 520 A.2d 717 (1987); *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 621, 495 A.2d 838 (1985); *Washington Homes, Inc. v. Interstate Land Dev., Inc.,* 281 Md. 712, 717–18, 382 A.2d 555 (1978). *See also King v. Bankerd,* 303 Md. at 110–12, 492 A.2d 608;

*Lynx, Inc. v. Ordnance Products, Inc.*, 273 Md. 1, 8, 327 A.2d 502 (1974).

## Facts

As the matter *sub judice* is in an early stage of factual development, the facts are gleaned from the allegations contained in Singer's complaint, along with the evidentiary materials submitted in connection with the motions that developed during discovery.[1] The facts are substantially as follows:

BG & E is a regulated public utility which furnishes gas and electricity to consumers in Maryland. The Link Division of Singer is a high technology software engineering firm which makes training simulators for government and industry. In 1982, Singer opened a manufacturing facility at the Sieling Industrial Park, located in Columbia, Maryland. As BG & E was the exclusive supplier of electricity to the Sieling Industrial Park, Singer contracted with the utility company for a supply of electrical power to its facility.

During all relevant time periods, Singer's business was dependent upon a constant and uninterrupted supply of electricity. Singer's simulators were run by computer systems which could not be operated without electrical power. The heating, ventilation and air conditioning systems in the building Singer occupied were also driven by electrical power.

During 1983, Singer experienced eight electrical power interruptions or outages at its Columbia facility.[2] The date, time and duration of those interruptions follows:

---

1. We do not consider the deposition transcript Singer filed with the lower court on May 23, 1988—the same day Singer noted its appeal to this court. Md.Rule 8–131.

2. Singer's present suit does not include claims based upon the 1983 power interruptions.

| Date | Time | Duration |
|------|------|----------|
| May 27, 1983 | 2:00 p.m. | Minutes |
| May 28, 1983 | 7:30 a.m. | 1 hour |
| May 29, 1983 | Time Not Recorded | Minutes |
| August 3, 1983 | 6:30 a.m. | Minutes |
| August 29, 1983 | 1:00 p.m. | 2 hours |
| September 8, 1983 | 5:00 p.m. | Minutes |
| October 4, 1983 | 7:45 a.m. | Minutes |
| October 13, 1983 | 1:30 p.m. | Minutes |

After the October 13, 1983 outage, the power interruptions ceased for nearly eight months. Commencing June 8, 1984, however, Singer's Columbia facility experienced the following interruptions in its supply of electricity:

| Date | Time | Duration |
|------|------|----------|
| June 8, 1984 | 11:40 a.m. to 1:15 p.m. | 1.5 hours |
| June 21, 1984 | 6:20 p.m. | Minutes |
| Oct. 23, 1984 | 5:30 a.m. to 6:30 a.m. | 1 hour |
| Nov. 30, 1984 | 10:00 a.m. to 11:00 a.m. | 1 hour |
| Dec. 7, 1984 | 12:00 noon to 3:30 p.m. | 3.5 hours |
| | | |
| Jan. 10, 1985 | 11:10 a.m. to 12:40 p.m. | 1.5 hours |
| Jan. 10, 1985 | 2:30 p.m. | Minutes |
| Apr. 29, 1985 | 1 Power Dip | Minutes |
| May 21, 1985 | 12:45 p.m. | Minutes |
| June 5, 1985 | 5:30 p.m. | Minutes |
| July 24, 1985 | 1:30 p.m. to 2:15 p.m. | .75 hour |
| Aug. 1, 1985 | 1:30 p.m. | Minutes |
| Aug. 11, 1985 | Time Not Recorded | 2.5 hours |
| Aug. 13, 1985 | 10:50 a.m. to 1:15 p.m. | 2.5 hours |
| Sept. 15, 1985 | 2:30 p.m. | Minutes |
| Oct. 31, 1985 | Time Not Recorded | 3 Separate Power Dips |
| Nov. 30, 1985 | Time Not Recorded | 1.5 hours |
| Dec. 30, 1985 | 10:00 a.m. | Minutes |
| | | |
| Feb. 5, 1986 | 9:30 a.m. to 10:20 a.m. | 1 hour |
| Mar. 22, 1986 | 4:30 p.m. | Duration Not Recorded |
| Apr. 5, 1986 | 8:40 p.m. | Minutes |
| June 2, 1986 | 5:15 a.m. | Minutes |
| June 3, 1986 | 3:00 p.m. to 5:30 p.m. | 2.5 hours |
| June 6, 1986 | 2:50 p.m. to 5:30 p.m. | 2.75 hours |
| July 8, 1986 | 10:30 a.m. to 2:00 p.m. | 3.5 hours |
| July 8, 1986 | 8:30 p.m. to 8:45 p.m. | .25 hour |
| July 17, 1986 | 12:30 p.m. to 2:30 p.m. | 2 hours |

| Date | Time | Duration |
|------|------|----------|
| July 29, 1986 | 5:40 p.m. to 10:00 p.m. | 4.75 hours |
| July 30, 1986 | 1:35 p.m. to 3:00 p.m. | 1.5 hours |
| Aug. 7, 1986 | 3:26 p.m. to 10:32 p.m. | 7 hours |
| Sept. 9, 1986 | 3:00 p.m. to 4:30 p.m. | 1.5 hours |

Upon the occurrence of those power outages which were more than momentary interruptions or dips in power, Singer contacted BG & E and reported the incident. During extended power outages, Singer would contact BG & E at thirty minute intervals throughout the time period of the outage. Upon the restoration of electric power after an outage, four Singer employees usually were required to devote approximately two hours to restore the simulator computer facility; another four employees usually were required to devote approximately three hours to repair and restart the simulator equipment.

On August 29, 1986, shortly after the seven hour August 7, 1986 power outage, BG & E sent a letter to Singer explaining the cause of the power interruptions experienced at Singer's facility. That letter stated, in pertinent part, as follows:

During the past several months your portion of the Sieling Industrial Park has been subjected to frequent service interruptions. These were due primarily to multiple failures on the underground cable leading from our Columbia Sub–Station. Additionally, we have experienced damage to cable terminations at several transformers supplying the Industrial Park following severe lightning storms.

To address these problems we have taken the following action:

* The 4,000 foot section of underground cable which experienced failures has been replaced.

* Our construction personnel will be inspecting all transformer terminations within the Industrial Park and will make repairs as necessary.

Prior to sending the letter, BG & E had not informed Singer that the power interruptions it experienced at the Columbia facility were the result of a defective underground cable.[3]

### Uniform Commercial Code—Implied Warranties

■ The trial court dismissed Singer's claims (Counts II and III) that the electric power outages constituted breaches of the UCC implied warranties of merchantability, Md. Comm.Law Code Ann. § 2–314 (1975, 1988 Cum. Supp.), and fitness for a particular use. Md.Com.Law Code Ann. § 2–315. The court's decision was based upon its determination that Title 2 of the UCC applied only to "transactions in goods," Md.Com.Law Code Ann. § 2–102, that electricity did not fall within the classification of "goods" as defined in the UCC, Md.Com.Law Code Ann. § 2–105, and, therefore, that UCC implied warranties were inapplicable to the electrical power outages at Singer's facility.

Singer asseverates that the trial court erred in dismissing its UCC warranty claims. On this point, Singer contends that the electricity BG & E agreed to provide to its facility comprised "goods" as that term is defined in Section 2–105.[4]

Whether electricity may be considered a good—thus subjecting a utility company to breach of warranty actions under Title 2 of the UCC—has not previously been addressed by either the Court of Appeals or this court. *See Lathroum v. Potomac Elect. Power Co.*, 309 Md. 445, 451

---

**3.** Prior communications by BG & E tended to suggest that the cause of the power outages lay not in the utility company's distribution system, but rather in Singer's facility or equipment. For example, during November 1984, BG & E offered its "premium electric service diagnostic study" and "premium electric service" to Singer for a fee. Singer declined BG & E's offer.

**4.** Section 2–105 provides, in pertinent part, as follows:
(1) "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract. . . .
(2) Goods must be both existing and identified before any interest in them can pass. Goods which are both not existing and identified are "future" goods. A purported present sale of future goods or of any interest therein operates as a contract to sell.

n. 8, 524 A.2d 1228 (1987). Courts in other jurisdictions, however, applying uniform codes identical or similar to Maryland's UCC, have had occasion to decide this issue. *See, e.g., Hedges v. Pub. Serv. Co.,* 396 N.E.2d 933 (Ind.App. 1979); *Helvey v. Wabash County REMC,* 151 Ind.App. 176, 278 N.E.2d 608 (1972); *Williams v. Detroit Edison Co.,* 63 Mich.App. 559, 234 N.W.2d 702 (1975); *Buckeye Union Fire Ins. Co. v. Detroit Edison Co.,* 38 Mich.App. 325, 196 N.W.2d 316 (1972); *Farina v. Niagara Mohawk Power Corp.,* 81 A.D.2d 700, 438 N.Y.S.2d 645 (1981); *Cincinnati Gas & Elec. v. Goebel,* 28 Ohio Misc.2d 4, 502 N.E.2d 713 (Hamilton County Mun. Ct.1986).

We think it significant to our resolution of the present issue, however, that no reported decision which we have encountered has held electricity to be a good while it remained in a utility company's distribution system. On the contrary, in *Hedges, supra,* an Indiana appellate court held, *inter alia,* that raw electricity encountered in an unmarketed and unmarketable state in an overhead transmission cable was not a good covered by that jurisdiction's version of the UCC. Similarly, in *Goebel, supra,* an Ohio court, after a thorough review of the relevant caselaw, impliedly held that electricity in its raw state—i.e., that which had not yet been transformed into metered amounts by passing through utility-owned conduits and into the homes of consumers—was not a good as defined in that state's UCC.

We believe the reasoning contained in *Hedges* and *Goebel* to be sound and, accordingly, view those cases as persuasive authority. In addition, we are mindful that raw high voltage electricity contained in a utility company's distribution system, because it has not yet been converted into a useable state of lower voltage by passing through a meter into a customer's home or place of business, is not the refined product that the customer intends to buy. *See Hedges,* 396 N.E.2d at 936; *Goebel,* 28 Ohio Misc.2d at 5, 502 N.E.2d at 715. *See also* Md.Regs.Code tit. 20, § 50.07.02 (1988). For those reasons, we are convinced that

electricity which remains in a utility company's distribution system is not a good within Title 2 of Maryland's UCC.

■ Applying the foregoing to the present case, we recognize that Singer's UCC warranty claims are apodictically premised upon its allegation that defects in an underground feeder—part of BG & E's distribution system—resulted in electrical current failing to pass through its meter and, thus, into its facility. We hold, therefore, that the trial court did not err in dismissing Singer's UCC warranty claims.

### Limitations—Breach of Contract

■ The trial court, relying upon the "discovery rule" as adopted by the Court of Appeals in *Poffenberger v. Risser*, 290 Md. 631, 637–38, 431 A.2d 677 (1981), determined that Singer's common law contract action (Count I) accrued immediately after the August 29, 1983 power interruption and, therefore, was time-barred pursuant to the three-year limitations period of Md.Cts. & Jud.Proc.Code Ann. § 5–101 (1974, 1984 Repl.Vol., 1988 Cum.Supp.).

Singer takes issue with the trial court's determination on this point. In particular, Singer contends that BG & E had a continuing contractual obligation to supply it with electricity. Singer thus posits that each power outage at its facility constituted a separate and distinct breach of BG & E's contractual obligation. Accordingly, Singer would have us conclude that each successive breach commenced a separate cause of action for limitations purposes.

Section 5–101 provides that "[a] civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." As there is no other applicable Code provision, Section 5–101 governs the limitations period applicable to common law contract

actions.[5] *Mayor of Federalsburg v. Allied Contractors, Inc.*, 275 Md. 151, 157, 338 A.2d 275, *cert. denied*, 423 U.S. 1017, 96 S.Ct. 452, 46 L.Ed.2d 389 (1975); *DeGroft*, 72 Md.App. at 171, 527 A.2d 1316; *Antigua Condominium Ass'n v. Melba Investors Atlantic, Inc.*, 65 Md.App. 726, 748, 501 A.2d 1359, *aff'd in part, rev'd in part*, 307 Md. 700, 517 A.2d 75 (1986).

As a general rule, a common law contract action accrues under Section 5–101 when there is a breach or at least an anticipatory breach of the contract. *DeGroft v. Lancaster Silo Co.*, 72 Md.App. at 171, 527 A.2d 1316; *Yingling v. Phillips*, 65 Md.App. 451, 460, 501 A.2d 87 (1985). With respect to such actions, however, we have stated that "[i]f the aggrieved party is unaware of the breach when it occurs, the discovery rule applies and the cause of action accrues when the aggrieved party is aware or should be aware that he has been injured." *Yingling v. Phillips*, 65 Md.App. at 460–61, 527 A.2d 1316 (citing *Poffenberger v. Risser*, 290 Md. at 636, 431 A.2d 677). We observe that while the discovery rule may thus delay the accrual of a contract matter, it cannot operate to make such an action accrue earlier than the date of the breach or anticipatory breach.

In the present case, it is undisputed that, subject to certain limitations, BG & E had a continuing contractual obligation to provide Singer with electricity. *See* Md.Regs. Code tit. 20, §§ 50.04.06 and 50.07.05. We thus perceive that our resolution of the issue *sub judice* turns upon a determination of whether a contract action based upon various alleged breaches of a continuing contractual obligation accrues for all time upon the first breach of that obligation of which the aggrieved party is aware or should have been aware, or whether each successive breach of such an obligation begins the running of the statute of limitations anew.

---

5. Md.Cts. & Jud.Proc.Code Ann. § 5–102(a)(6) establishes a twelve-year limitations period for contracts under *seal.*

Although there is an absence of reported Maryland case-law on point,[6] appellate courts from other jurisdictions have addressed this issue in a variety of contractual scenarios. *See Airco Alloys Div., Airco, Inc. v. Niagara Mohawk Power Corp.,* 76 A.D.2d 68, 430 N.Y.S.2d 179 (Sup.Ct., App.Div.1980); *Dameron v. Sinai Hospital of Baltimore, Inc.,* 815 F.2d 975 (4th Cir.1987); *Barker v. Jeremiasen,* 676 P.2d 1259 (Colo.App.1984); *Bulova Watch Co. v. Celotex Corp.,* 46 N.Y.2d 606, 415 N.Y.S.2d 817, 389 N.E.2d 130 (1979); *Green v. Petersen,* 218 N.Y. 280, 112 N.E. 746 (1916); *Mead Reinsurance Corp. v. Town of Oyster Bay,* 138 A.D.2d 578, 526 N.Y.S.2d 159 (1988); *Franza's Universal Scrap Metal, Inc. v. Town of Islip,* 89 A.D.2d 843, 453 N.Y.S.2d 24 (1982). *Indian Territory Illuminating Oil Co. v. Rosamond,* 190 Okla. 46, 120 P.2d 349 (1941); *Sims v. Falvey,* 234 S.W.2d 465 (Tex.Civ.App.1950). For example, in *Airco Alloys, supra,* a case involving a utility company's failure to provide certain customers with relinquished replacement power, the court ruled that "where a contract provides for continuing performance over a period of time, each breach may begin the running of the statute (of limitations) anew such that accrual occurs continuously and plaintiffs may assert claims for damages occurring (within the limitations period)." 76 A.D.2d at 80; 430 N.Y.S.2d at 186 (citations omitted). In *Barker, supra,* the plaintiffs brought suit in 1979 alleging that the defendants' horse operation violated certain protective covenants. In response, the defendants, noting that the record unequivo-

---

**6.** In *Booth Glass Co. v. Huntingfield Corp.,* 304 Md. 615, 500 A.2d 641 (1985), the Court of Appeals held that the trial court had properly granted Booth's motion to dismiss Huntingfield's negligence and contract actions because they were time-barred under Section 5–101, as a matter of law. In *Sisters of Mercy v. Gaudreau, Inc.,* 47 Md.App. 372, 423 A.2d 585 (1980), we held that the trial court had properly determined that the Sisters' attempt to compel arbitration as a result of defects in a building Gaudreau had designed was barred by Section 5–101, as a matter of law. These cases, however, are inapposite to the matter *sub judice;* in neither case did the defendant have a continuing contractual obligation to the plaintiff or commit a breach within the limitations period.

cally established violations of the covenants commencing in 1974, argued, *inter alia*, that the action was time-barred under a statute requiring the bringing of such an action within three years after the cause accrued. The court, after observing that the covenants imposed a continuing obligation upon the defendants and that repeated and successive breaches of the covenants had continued within three years of the suit, held that any damage claims resulting from breaches which occurred within the limitations period were not time-barred.

We believe the rationale expressed by the foregoing cases is sound. For that reason, and because barring such claims would not serve to promote the policies that statutes of limitations reflect, *see Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 665, 464 A.2d 1020 (1983), we conclude that where a contract provides for continuing performance over a period of time, each successive breach of that obligation begins the running of the statute of limitations anew, with the result being that accrual occurs continuously and a plaintiff may assert claims for damages occurring within the statutory period of limitations.

In the present case, we have already noted that, subject to certain limitations, BG & E had an ongoing contractual obligation to supply Singer with electrical power. Furthermore, we are mindful that the contract claims asserted by Singer in the complaint are limited to those alleged breaches and resulting damages which occurred within three years of the filing of the suit. Accordingly, we hold that the trial court erred, as a matter of law, in determining that Singer's common law contract claims were barred by limitations.

## Limitations—Negligence

The lower court, again relying upon the discovery rule, *Poffenberger*, 290 Md. at 637–38, 431 A.2d 677, concluded that Singer's actions for negligence (Counts IV, V and VI) accrued immediately after the August 29, 1983 power interruption and, therefore, were time-barred by the limitations period of Section 5–101.

On appeal, Singer avers that the trial court erred in concluding that its negligence claims accrued more than three years before it filed suit. In support of its position, Singer advances the dual grounds that BG & E breached ongoing duties owed its customer and that Singer's present damage claims are limited to those it incurred within three years prior to the date it filed suit.

Section 5–101, as we have already observed, provides a three-year limitations period from the time an action "accrues." The time period of Section 5–101 governs negligence actions. *See Booth Glass,* 304 Md. at 622, 500 A.2d 641; *Hanscome v. Perry,* 75 Md.App. 605, 612–13, 542 A.2d 421 (1988). As we have also noted above, the discovery rule provides that a cause of action cannot be deemed to accrue until an aggrieved party knew, or reasonably should have known, of the wrong committed. *Poffenberger,* 290 Md. at 637–38, 431 A.2d 677. The discovery rule is generally applicable to all tort actions. *Booth Glass,* 304 Md. at 619, 500 A.2d 641.

It is well settled in Maryland, however, that a tort cause of action based upon the breach of a duty which is continuing in nature and seeking recovery of damages incurred within the limitations period, is not time-barred. *See Shell Oil Co. v. Parker,* 265 Md. 631, 636, 291 A.2d 64 (1972); *Martin v. Arundel Corp.,* 216 Md. 184, 192–93, 140 A.2d 146 (1958); *Consolidated Pub. Util. Co. v. Baile,* 152 Md. 371, 376, 136 A. 825 (1927); *Commissioners of Aberdeen v. Bradford,* 94 Md. 670, 673–74, 51 A. 614 (1902); *Anne Arundel County v. Litz,* 45 Md.App. 186, 197, 412 A.2d 1256 (1980).

In the case at bar, Singer's negligence claims are irrefutably premised upon the allegation that BG & E breached ongoing duties owed its customer. Furthermore, it is undisputed that the damages for which Singer presently seeks recovery were incurred within three years of the commencement of the present action. We hold, therefore,

that the trial court erred, as a matter of law, in determining that Singer's negligence claims were time-barred.

## BG & E's Electric Service Tariff

 While the trial court erred in entering judgment against Singer on the basis that its common law contract and negligence claims were time-barred, BG & E urges that we may nevertheless affirm the court's decision with respect to Singer's breach of contract (Count I), negligence supply (Count IV), and negligent repair (Count V) claims on the alternative ground that BG & E's Electric Service Tariff exempts the company from liability for power outages unless any such incidents are due to conduct on the part of BG & E which amounts to "willful default or neglect." BG & E correctly notes that this argument was one of numerous alternative grounds raised below in support of its motion.[7]

The case at bar involves the extent of BG & E's liability for failure to supply electricity to a customer. In that regard, Section 2.5 of BG & E's Tariff, as approved by the Public Service Commission, provides as follows:

[BG & E] is not liable for any loss, cost, damage or expense to any Customer occasioned by any failure to supply electricity according to the terms of the contract or by any interruption or reversal of the supply of electricity, if such failure, interruption or reversal is due to storm, lightning, fire, flood, drought, strike, or any cause beyond the control of [BG & E], or any cause except willful default or neglect on its part.

Initially, then, we are called upon to construe the phrase "willful default or neglect" in the context of its usage in Section 2.5 of the Tariff. Although neither the Court of Appeals nor this court has had occasion to construe this language, we are aided in our endeavor by well settled rules of statutory construction—rules which we consider applica-

---

7. BG & E did not argue below, and does not contend here, that Singer's gross negligence claim (Count VI) is barred by the Tariff, as a matter of law. We, therefore, do not address that issue.

ble to the interpretation of a utility company's tariff as approved by the Public Service Commission pursuant to an enactment of the General Assembly.[8]

Because of the adjective "willful" preceding "default or neglect," we believe ambiguity exists regarding the meaning of the phrase in question.[9] Although the phrase is susceptible to more than one construction, it should be given the meaning intended by the Tariff's authors. *See Hornbeck v. Somerset Co. Bd. of Educ.*, 295 Md. 597, 619–20, 458 A.2d 758 (1983); *Bradshaw v. Prince George's Co.*, 284 Md. 294, 301, 396 A.2d 255 (1979). In considering the pertinent phrase in Section 2.5, therefore, we may consider not only the literal or usual meaning of its words but its meaning and effect with reference to the objectives and purposes to be accomplished by the provision, together with the consequences resulting from one meaning rather than another, with the real intent prevailing over intent as indicated by a literal reading of the words used. *See Comptroller of the Treasury v. Fairchild Industries, Inc.*, 303 Md. 280, 288, 493 A.2d 341 (1985). Thus, we must shun any interpretation which is unreasonable, illogical, or inconsistent with common sense. *See Blandon v. State*, 304 Md. 316, 319, 498 A.2d 1195 (1985); *Erwin & Shafer, Inc. v. Pabst Brewing Co.*, 304 Md. 302, 311, 498 A.2d 1188 (1985); *Bailey v. Woel*, 302 Md. 38, 43, 485 A.2d 265 (1984).

---

**8.** While the issue as to whether the rules of statutory construction apply to judicial interpretation of a utility company's tariff has not previously been addressed by a Maryland appellate court, the Court of Appeals has concluded that those rules should be used for the interpretation of regulations of an administrative agency. *Messitte v. Colonial Mortgage Serv. Co.*, 287 Md. 289, 293, 411 A.2d 1051 (1980). *See also United Parcel Serv., Inc. v. Comptroller of the Treasury*, 69 Md.App. 458, 470 (1986).

**9.** By way of language contrast, we note that in the State of New York the electric company's liability for interruption of service is clearly limited to damages arising from the utility's "willful misconduct or gross negligence." *See, e.g., Food Pageant, Inc. v. Consolidated Edison Co., Inc.*, 54 N.Y.2d 167, 445 N.Y.S.2d 60, 429 N.E.2d 738 (1981).

In construing the phrase in question, we are cognizant that the term "neglect," standing alone, denotes negligence. *See* Black's Law Dictionary 930 (5th Ed.1979). Accordingly, any construction of Section 2.5 which predicates BG & E's liability for power interruptions upon "willful default" *or* "neglect" would effectively result in BG & E being held liable for power interruptions resulting from ordinary negligence. We recognize, however, that power outages are ofttimes an inevitable consequence of supplying electrical power and that the extent of a utility's liability exposure and utility rates are inextricably intertwined. Thus, we believe such a construction would severely undermine the public policy consideration of maintaining utility rates at reasonable levels. *Accord Southwestern Sugar & Molasses Co. v. River Terminals Corp.*, 360 U.S. 411, 417, 79 S.Ct. 1210, 1214, 3 L.Ed.2d 1334 (1959); *Western Union Tel. Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 571, 41 S.Ct. 584, 586, 65 L.Ed. 1094 (1921); *Waters v. Pacific Tel. Co.*, 12 Cal.3d 1, 6–7, 114 Cal.Rptr. 753, 756, 523 P.2d 1161, 1164 (1974); *Southern Bell Tel. & Tel. Co. v. Invenchek, Inc.*, 130 Ga.App. 798, 800, 204 S.E.2d 457, 459–60 (1974); *Lee v. Consol. Edison Co.*, 98 Misc.2d 304, 305, 413 N.Y.S.2d 826, 828 (App.Term 1978); *Abraham v. New York Tel. Co.*, 85 Misc.2d 677, 680–81, 380 N.Y.S.2d 969, 972 (N.Y.County 1976). Furthermore, as it is beyond cavil that the singular purpose of Section 2.5 is to limit BG & E's liability for power outages, we are convinced that such a construction would be inconsistent with common sense. For these reasons, we construe Section 2.5 as limiting BG & E's liability to those instances where it is sufficiently established that a power interruption was due to the utility company's "willful default" or "willful neglect." We believe this interpretation comports with well settled principles of statutory construction and effectuates the rationale for limiting the utility company's liability with respect to power outages.

We shall now undertake to define "willful default" and "willful neglect" as those phrases are used in Section 2.5. In that regard, we note the general rule that terms used in

a provision, not there specifically defined, should be construed as having their ordinary commonly accepted meanings. *Baltimore Gas & Elec. Co. v. Bd. of Comm'rs*, 278 Md. 26, 31, 358 A.2d 241 (1976); *Scoville Serv., Inc. v. Comptroller of the Treasury*, 269 Md. 390, 395, 306 A.2d 534 (1973); *Gaspin v. Browning*, 265 Md. 552, 555, 290 A.2d 507 (1972); *Arundel Supply Corp. v. Cason*, 265 Md. 371, 377, 289 A.2d 585 (1972). A primary meaning of the word "willful" in Black's Law Dictionary is "[i]ntending the result which actually comes to pass; designed; intentionally; not accidental or involuntary." Black's, *supra*, at 1434. A primary definition of the term "default" is "the omission or failure to perform a legal or contractual duty." *Id.*, at 376. *Accord Easterwood v. Willingham*, 47 S.W.2d 393, 395 (Tex. Civ.App.1932). Thus, we conclude that the phrase "willful default" means an intentional omission or failure to perform a legal or contractual duty. We further believe that the phrase "willful neglect" suggests intentional, conscious, or known negligence—a knowing disregard of a plain or manifest duty. *See* Black's, *supra*, at 1435; *Puget Sound Painters, Inc. v. State*, 45 Wash.2d 819, 822, 278 P.2d 302, 303–04 (1954).

In light of the foregoing analysis, we shall remand this matter to the circuit court so that it may make a first-level determination as to whether Singer's common law breach of contract, negligent supply and negligent repair counts sufficiently allege that the power interruptions it experienced at its Columbia facility resulted from "willful default or neglect" on the part of BG & E.

JUDGMENT AS TO COUNTS TWO AND THREE OF THE COMPLAINT AFFIRMED; JUDGMENT AS TO COUNTS ONE, FOUR, FIVE AND SIX OF THE COMPLAINT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR HOWARD COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID ONE–THIRD BY THE APPELLANT AND TWO–THIRDS BY THE APPELLEE.