**PREMIER PARKS, INC., Plaintiff,**

v.

**BALTIMORE GAS & ELECTRIC CO., et al., Defendants.**

**Civil No. AMD 97–740.**

United States District Court,
D. Maryland.

Feb. 18, 1999.

Adam Jason Sevel, Baltimore, Steven L. Smith, Cozen & O'Connor, Philadelphia, PA, for plaintiff.

Baltimore Gas & Electric Company, Laurie R. Bortz, Baltimore, Driggs Corporation, Ileen M. Ticer, Ticer & Associates, Hunt Valley, Driggs Corporation, Gerard J. Emig, Gleason, Flynn & Emig, Rockville, MD, for defendants.

## MEMORANDUM

DAVIS, District Judge.

This is a negligence action arising under Maryland law, which is here based on diversity of citizenship jurisdiction. Plaintiff Premier Parks, Inc. ("Premier") is an Oklahoma corporation that operates an amusement park in Maryland. The defendants are Baltimore Gas & Electric Co. ("BGE"), a public utility, the Driggs Corporation ("Driggs"), a Virginia construction company, and John W. McDonald, Jr., an individual who operates a trucking company as a sole proprietorship. Pending before the court are motions for summary judgment filed by BGE and Driggs in respect to Premier's second amended complaint and BGE's motion for summary

judgment as to Driggs' cross claim for indemnity/contribution. No hearing is necessary. For the reasons set forth below, BGE's motions shall be granted and Driggs' motion shall be denied.

## FACTS

Premier operates Adventure World amusement park in Prince George's County. Allegedly as a result of the occurrence described below, the amusement park lost electric power and had to cease operations for a significant portion of the day on August 12, 1995.

Driggs was conducting a road-widening project near the park for the State of Maryland. In connection with the work, much of it performed at night, Driggs used concrete barriers to redirect traffic and to close off portions of the road where it was working. The barriers were kept at a nearby storage facility until they were needed. Driggs hired equipment rental companies to transport the barriers to and from the work site. Drivers from the J.W. McDonald Company (using McDonald Co. trucks) were transporting barriers on the night of the occurrence.

The truck drivers were instructed by Driggs personnel to pick up the barriers at the storage facility and then to deliver them to the work site. At the work site, Driggs set up an unloading area. As a McDonald driver was departing the unloading area to return to the storage facility to retrieve additional barriers, the truck struck and severed a guy wire connected to a BGE utility pole. The guy wire recoiled and contacted live overhead electrical wires, causing a power outage in the area.

The nighttime accident caused a power outage at Premier's facility, and allegedly also caused damage to the park's electrical equipment. Although BGE workers restored power promptly on the night of the outage, a second outage occurred at the park on the afternoon of the next day. As a result of the second outage and its duration (about four hours), during which some patrons were trapped on amusement rides, the entire park had to be closed. Premier alleges that it suffered economic losses in excess of $300,000 in consequence of the second power outage.

Premier has sued in four counts. Count I alleges common law negligence against Driggs and McDonald for their acts and omissions in causing the original disruption and the consequential damages (including the subsequent outage) allegedly arising therefrom. Count II alleges common law negligence against BGE in a number of particulars, including but not limited to the placement and maintenance of equipment; negligent inspection and repairs and related theories. Count III alleges breach of contract/breach of warranty against BGE. Count IV purports to allege an equal protection claim against BGE. The theory seems to be that BGE's state law immunity for its mere negligence in failing to provide service (as described *infra*) deprives Premier of substantially equal treatment (in terms of its ability to recover against a public utility for ordinary negligence) accorded similarly situated consumers of utility services in other areas of the state, and that such deprivation occurs "under color of law."

## SUMMARY JUDGMENT STANDARDS

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

## ANALYSIS

### A.

While denying that it breached any duty of care in any respect, BGE posits that as to either a tort or contract/warranty theory, Premier's evidence amounts at most to a showing of simple negligence. Thus, it seeks summary judgment on the ground that its Electric Service Tariff ("Tariff") immunizes it from liability under the facts of this case. Section 2.5 of the Tariff, as approved by the Maryland Public Service Commission ("PSC"), states as follows:

[BGE] is not liable for any loss, cost, damage or expense to any Customer occasioned by any failure to supply electricity according to the terms of the contract or by any interruption or reversal of the supply of electricity, if such failure, interruption or reversal is due to storm, lightning, fire, flood, drought, strike, or any cause beyond the control of [BGE], or any cause *except willful default or neglect* on its part.(emphasis added).

The Tariff is a part of every contract for electric service entered into with BGE. Such provisions commonly appear in the tariffs of utility companies nationwide. The instant Tariff provision has been consistently approved by the PSC. *See Singer Co., Link Simulation Systems Div. v. Baltimore Gas and Electric Co.,* 79 Md.App. 461, 477–80, 558 A.2d 419 (1989); *In Re Liability of Electric Power Companies for Injury or Damages Resulting from Problems in the Delivery of Electric Power,* 82 Md. P.S.C. 92 (1991).

Premier argues that the phrase "willful default or neglect" is ambiguous as a matter of law, and therefore the question of its meaning and proper application must be submitted to the fact finder as would any ambiguous contractual term. BGE contends, however, that the proper interpretation of the disputed Tariff provision has already been resolved as a matter of Maryland law. BGE is correct.

The Maryland Court of Special Appeals construed the disputed phrase in *Singer Co.,* applying settled rules of *statutory* construction. 79 Md.App. at 477–80, 558 A.2d 419. The court recognized the inherent ambiguity in having the adjective "willful" precede the words "default or neglect." *Id.* at 478, 558 A.2d 419. The court examined the intent and purpose of the Tariff. *Id.* The court recognized that the purpose of the Tariff was to further the public policy goal of maintaining reasonable utility rates. Thus, an interpretation of the phrase as urged by Premier here—that the word "willful" modified only

the word "default" and not the word "neglect"—would result in BGE being held liable for power interruptions resulting from its ordinary negligence. The court rejected this interpretation because it would undermine the goal of maintaining utility rates at reasonable levels and was thus contrary to common sense. *Id.* at 479, 558 A.2d 419, citing, *inter alia, Southwestern Sugar & Molasses Co. v. River Terminals Corp.,* 360 U.S. 411, 417, 79 S.Ct. 1210, 3 L.Ed.2d 1334 (1959); *Western Union Tel. Co. v. Esteve Bros. & Co.,* 256 U.S. 566, 571, 41 S.Ct. 584, 65 L.Ed. 1094 (1921).

■ Thus, the court held as follows, as to claims based on both negligence and breach of contract theories: "[W]e construe Section 2.5 as limiting BGE's liability to those instances where it is sufficiently established that a power interruption was due to the utility company's 'willful default' or 'willful neglect.'" 79 Md.App. at 479, 558 A.2d 419. Based upon the ordinary meaning of the words employed, the court held that the phrase "willful default" means an "intentional omission or failure to perform a legal or contractual duty." *Id.* Similarly, the court interpreted the term "willful neglect" to mean an "intentional, conscious, or known negligence—a knowing disregard of a plain or manifest duty." *Id.* Under both definitions, the act or omission giving rise to liability must in its essential character be accurately described as "designed" or "intentional[ ]; not accidental." *Id.*

Under *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the intermediate state appellate court's interpretation of the Tariff is binding on this court. *Assicurazioni Generali, S.p.A. v. Neil,* 160 F.3d 997, 1002 (4th Cir.1998). Accordingly, I shall apply it in this case to the claims asserted by Premier against BGE.

**B.**

Premier contends that even if "willful neglect" must be shown, it has adduced

sufficient evidence to generate a dispute of material fact as to whether BGE's acts and omissions rise to the level of "willful neglect." This contention is unpersuasive. A review of Premier's myriad theories of liability as to BGE readily demonstrates that, at most, BGE has been guilty of simple negligence.

■ Premier claims that BGE acted "willfully" in failing to replace or "bypass" certain equipment even before the accident occurred in August 1995. This contention is unavailing.

Premier references an e-mail between BGE personnel which indicated that a new circuit design for the area of the Premier facility "calls for [certain] fuses to be bypassed ... during the heavily loaded summer period." The record shows that every year BGE conducts "load forecasts" to determine whether or not to bypass in-line fuses for the following year. There is deposition testimony in the record that BGE's internal policy of bypassing fuses based upon the forecasted loads did not require the fuses at issue to be bypassed in the summer of 1995. As well, BGE personnel that are responsible for monitoring "load feeders," which are changed seasonally, "make sure that any protective devices such as fuses in there are capable of handling the loads that have historically been ˙on the lines." Finally, Premier's expert witness conceded that no relevant standard of care required that the disputed fuses be bypassed. Thus, the evidence shows that BGE was probably not negligent at all, but it certainly does not rationally support the conclusion that BGE's alleged acts and omissions constituted "willful neglect" when it did not remove or bypass the fuses, the presence of which Premier contends contributed to the happening and severity of the occurrence.

■ Premier next contends that BGE's failure to act constituted "willful neglect" in that it did not remove a line (a "single-phase tap") running to an abandoned

structure. Specifically, Premier's expert suggested that if the poles and unused lines had "not been there to begin with," the accident would not have happened. Regardless of how Premier viewed the line, however, it had not been abandoned by BGE. Moreover, even when a line is abandoned by a utility, the relevant standard of care, the National Electrical Safety Code ("NESC") provides two options on how to care for the line. At a utility's discretion, an abandoned line can be "maintained in a safe condition" or removed. *See* NECS § 214.B.3. There is no evidence in the record that the single-phase tap was maintained in an unsafe manner, and there is no factual basis, in any event, for Premier's allegation that BGE's failure to remove the line constituted "willful neglect."

■ Premier next claims that the BGE serviceman acted with "willful neglect" when he failed to inspect the voltage regulators after he restored power after the first outage. Plaintiff argues that it was foreseeable that the first outage might have damaged the regulators. BGE denies it was negligent in these regards. In any event, simply because the serviceman did not inspect the voltage regulators after he had apparently repaired the system on the night of the first outage does not amount to anything more than simple negligence, if it constituted negligence al all.

■ Premier next argues that BGE was tardy in responding to the second outage. It is undisputed that Premier reported the power outage at approximately 1:38 p.m. and the first serviceman did not arrive until 3:00 p.m. BGE states, without contradiction, the serviceman was working on a previous outage at the Annapolis Mall which involved a switchgear fire; a second serviceman arrived shortly after he reported to work. It is clear on these facts, as a matter of law, that if BGE was guilty of a breach of duty at all, such a breach of duty constituted ordinary negligence.

■ Premier next claims that BGE acted with "willful neglect" in failing to have in place a "system ... for informing its field personnel of recent equipment problems, despite knowing that such information would steer field personnel to look for secondary problems flowing from ... prior incidents." In other words, Premier contends that if the service personnel responding to the second outage had knowledge of the prior night's events, electrical service would have been restored more quickly and perhaps the park could have remained open. Premier does not support this allegation with any testimony from its expert witness that BGE should have had a different communications system in place. Moreover, BGE asserts without contradiction that even if its employees had knowledge of the events of the prior evening when they responded to the second outage, they would not have handled the second outage any differently. As a matter of law, therefore, Premier's allegation that the BGE communication system is deficient, even if true, does not rise to the "willful neglect" standard.

None of the remaining conclusory contentions relied on by Premier amounts to evidence sufficient to support a rational finding that BGE acted with "willful neglect." I previously denied BGE's motion to dismiss to give Premier a full opportunity to discover all the facts and circumstances surrounding BGE's acts and omissions at the time of the occurrence complained of in suit. Despite this opportunity for full discovery, Premier has not been able to adduce evidence that BGE entertained an "intentional, conscious, or ... knowing disregard of a plain or manifest duty." *Singer Co.*, 79 Md.App. at 479, 558 A.2d 419. Accordingly, BGE is entitled to judgment as a matter of law as to all of Premier's claims.[1]

---

1. The cross claim filed by Driggs against BGE fails for the same reasons that Premier's origi- nal claims fail, namely, the state law immunity enjoyed by BGE under the Tariff.

## C.

Premier has also alleged a somewhat incoherent claim that because the PSC has approved other electric utility tariffs which, unlike BGE's, permit customers of other state-regulated utility companies to sue for ordinary negligence, the difference in treatment between Premier and other (hypothetical) customers equates to a violation of the equal protection clause of the Fourteenth Amendment. This theory fails for any number of reasons, and not least of all because the Supreme Court has held that an ostensible constitutional claim cannot be founded upon the "state action" inherent in governmental approval of a utility's tariff. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 355–57, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Accordingly, I am not persuaded that the immunity BGE enjoys for its ordinary negligence in failing to provide electrical service tramples upon any equal protection right enjoyed by Premier.

## D.

In support of its motion for summary judgment, Driggs argues that at the time of the occurrence McDonald's truck driver was acting as an employee of an independent contractor. Therefore, says Driggs, under long-settled Maryland doctrine, as a matter of law, it is not liable for the damage caused by McDonald's driver because the driver was not its agent or servant. Premier concedes that an independent contractor's negligence ordinarily is not attributable to one who employs him, but relies on the fact-intensive nature of the agency inquiry in contending that a genuine dispute of material fact exists.

*Keitz v. National Paving & Contracting Co.*, 214 Md. 479, 134 A.2d 296 (1957), and *Clemons v. E. & O. Bullock, Inc.*, 250 Md. 586, 244 A.2d 240 (1968), together demonstrate paradigmatic examples of circumstances in which a court may not, *Keitz*, or may, *Clemons*, take the question of agency from the jury. The plaintiff in *Keitz* was a bus driver who was severely injured when the bus he was driving was hit head-on by a tractor trailer hauling limestone. The truck was owned by Sudbrook and was operated by Sudbrook's employee, Ogle. Sudbrook had leased the truck to National Paving for the purpose of hauling limestone to National Paving's facility. On appeal from a directed verdict for National Paving, the Court of Appeals reversed and remanded for a new trial. The court concluded that the plaintiffs had presented sufficient evidence at trial upon which a jury could reasonably conclude that Ogle was the servant of National Paving *as well as* Sudbrook at the time of the accident. 214 Md. at 491, 134 A.2d 296.

The business relationship between Sudbrook and National Paving generated approximately 80% of Sudbrook's revenues and had spanned approximately ten years. *Id.* at 486, 134 A.2d 296. Also, Sudbrook furnished trucks, drivers, mechanics and other employees to National Paving, and Sudbrook had instructed employees to take direction from National Paving's supervisors at the various work sites. Moreover, there was a history of an extensive commingling of trucks and employees. *Id.* at 486–88, 134 A.2d 296.

Thus, the court decided that under the circumstances a jury could conclude that Ogle had "two masters" for the purpose of applying principles of *respondeat superior*. *Id.* at 491, 134 A.2d 296. The court applied the following five criteria to determine if a relationship of master and servant exists: (1) the selection and engagement of the servant; (2) the payment of wages; (3) the power to discharge; (4) the power to control the servant's conduct; (5) and whether the work is a part of the regular business of the employer. *Id.* The court held that the fourth criteria is most often the weightiest. *Id.* ("Standing alone, none of these indicia, excepting (4), seem controlling in the determination as to whether [a master/servant] relationship exists. *The decisive test ... is whether the employer has the right to control and direct the servant in the performance of*

his work and in the manner in which the work is to be done."(emphasis added).

■ In *Clemons* an automobile accident occurred between a passenger vehicle and a dump truck operated by James Queen and owned by E. & O. Bullock, Inc. The dump truck was hauling material for Contee Sand & Gravel Co., Inc., upon whom plaintiffs sought to impose liability. The Court of Appeals applied the *Keitz* test and upheld the directed verdict granted by the trial court in favor of Contee. 250 Md. at 599–600, 244 A.2d 240. The court noted that the indicia of control over the truck driver and the manner of work pointed away from defendant Contee, which had hired Bullock to provide trucking services, and decidedly in favor of the actual employer, Bullock, or to the driver himself, who was free "to take as many or as few trips [for Contee] as he wanted per day." *Id.* at 599, 244 A.2d 240. The court summed up:

> It is the right to control rather than the actual exercise of control that is indicative of who is the master. The obligations of master are not assumed by one who merely directs the operator of a hired vehicle where and when it should be driven, or, in the case of a truck, what to haul.

*Id.* at 600, 244 A.2d 240.(emphasis added).

■ The facts in this case fall between the extremes of *Keitz* and *Clemons*. Driggs hired McDonald to transport the concrete barriers for less than a two week period; there is no evidence of a long term relationship or the commingling of employees and trucks. Nevertheless, there is significantly probative evidence that on the night of the accident, McDonald's drivers were not only *subject to* the control of the Driggs supervisors but that such *control*

was actually being exercised. Premier points to several undisputed facts which support the conclusion that Driggs exercised sufficient control over the McDonald driver to support the imposition of liability upon Driggs for such driver's negligence, including that: (1) the driver was required by Driggs to stay at the job site after the accident to provide information for the accident report; (2) the driver's pay was docked for the time it took to fill out the report; (3) the driver was not free to choose his path of travel into and out of the unloading area; (4) the driver was not free to leave the work site at any time he wished; (5) the driver was required to report to and get approval of his hours from Driggs; and (6) the driver was performing the work he was instructed to do by Driggs at the time of the accident.

Significantly, Premier also relies on the terms of the lease agreements (one agreement covering each truck and driver combination) between Driggs and McDonald as substantial evidence tending to establish Driggs' right to control the McDonald drivers. The lease agreements provided, in pertinent part:

> [Driggs] is solely responsible for the use, guidance and control of this leased equipment, although operated by Lessor's employee, and the Lessee hereby agrees to indemnify and save harmless [McDonald] from all claims of any nature arising out of or in consequence of the use or operation of this leased equipment.(emphasis added).[2]

I agree that this provision of the agreement between Driggs and McDonald is probative evidence on which a reasonable juror could reasonably rely in determining whether Driggs had a right of control sufficient to make the McDonald driver Driggs' servant under the rule of *Keitz*.[3]

---

2. Driggs notes that the indemnity language is very likely unenforceable under Maryland law. *See Heat & Power Corp. v. Air Products & Chemicals, Inc.,* 320 Md. 584, 592–94, 578 A.2d 1202 (1990). I need not determine that issue at this time.

3. Indeed, had Premier moved for summary judgment, the language in the lease agreement might be deemed to justify resolution of the issue of agency as a matter of law in its favor. *See* R.D. Hursh, Annotation, *Liability under Respondeat Superior Doctrine for Acts of Operator Furnished with Leased Machine or*

Accordingly, Driggs' motion for summary judgment shall be denied because the record presents a genuine dispute of fact over the question whether a master and servant relationship existed between Driggs and the McDonald driver who collided with the guy wire.[4] *See Sea Land Indus., Inc. v. General Ship Repair Corp.*, 530 F.Supp. 550, 563 (D.Md.1982)("What is apparent from the Maryland cases is that the issue whether a master and servant relationship exists in any case is essentially a factual question which must be determined by the trier of fact where the evidence is conflicting.").

### CONCLUSION

For the reasons set forth above, BGE is entitled to judgment as a matter of law as to Premier's claims as well as Driggs' cross claim. As to defendant Driggs, however, a dispute of material fact exists as to whether a master and servant relationship existed between Driggs and the employee of defendant McDonald. Accordingly, Driggs' motion for summary judgment is denied. An Order follows.

### ORDER

For the reasons stated in the foregoing Memorandum, it is this 18th day of February, 1999, by the United States District Court for the District of Maryland hereby ORDERED

*Motor Vehicle*, 17 A.L.R.2d 1388, § 2 (1951 & 1998 Supp.)("[O]ther factors enter into the determination of who is the master of an operator furnished with a leased machine or vehicle .... [T]he terms of an express contract between the lessor and lessee are accorded great weight."); *id.* at § 10 (collecting cases); *Kemp v. Creston Transfer Co.*, 70 F.Supp. 521, 534 (D.Iowa 1947)(contract provided that all equipment leased to the defendant was to be under "the complete possession, control, direction and dominion of [the lessee];" master and servant relationship established as a matter of law).

**4.** Premier also argues that Driggs' own negligence was a substantial contributing factor in causing the McDonald driver to collide with

(1) That Baltimore Gas & Electric Company's motions to dismiss or in the alternative for summary judgment (Paper Nos. 56 and 57) are GRANTED, AND COUNTS II, III AND IV OF THE SECOND AMENDED COMPLAINT AND THE CROSS CLAIMS OF DEFENDANT DRIGGS CORPORATION AGAINST BALTIMORE GAS AND ELECTRIC CO. ARE DISMISSED WITH PREJUDICE; and it is further ORDERED

(2) That Driggs Corporation's motion for summary judgment (Paper No. 55) is DENIED; and it is further ORDERED

(3) That the Clerk of Court TRANSMIT a copy of the foregoing Memorandum and this Order to the attorneys of record.

the guy wire. Specifically, Premier alleges that Driggs failed to provide adequate lighting around the guy wire and that the traffic flow into and out of the unloading area contributed to the accident. These contentions are belied by the evidence of record. Driggs' supervisor described the lighting at the scene as adequate and there is no evidence that the truck driver hit the guy wire as a result of poor lighting. Nor did Premier offer any factual support for the argument that the traffic flow caused the accident.

Driggs' "collateral negligence" defense need not be addressed. *See Washington Suburban Sanitary Commission v. Grady Devel. Corp.*, 37 Md.App. 303, 314–19, 377 A.2d 557 (1977).